Simeon MORIN, et al., Plaintiffs,

v.

Barry H. TRUPIN, et al., Defendants.

Norman E. GAAR, Plaintiffs,

v.

Barry H. TRUPIN, et al., Defendants.

Michael P. ALBERTI, M.D.,
et al., Plaintiffs,

v.

Barry H. TRUPIN, et al., Defendants.

Nos. 88 Civ. 5743 (RWS), 89 Civ. 6639 (RWS), 90 Civ. 3475 (RWS).

United States District Court,
S.D. New York.

Nov. 18, 1991.

Fink Weinberger, P.C., New York City (Stephen E. Powers, Eric W. Berry, of counsel), for plaintiffs Simeon Morin, et al.

Parker Chapin Flattau & Klimpl, New York City (Lee W. Stremba, Jerome Kowalski, of counsel), for Abrams' defendant.

McDonough Marcus Cohn & Tretter, P.C., New York City (Diane K. Kanca, of counsel), for Becker defendants.

D'Amato & Lynch, New York City (Stephen F. Willig, of counsel), for Mintz, Fraade defendants.

## OPINION

SWEET, District Judge.

Defendants Robert Abrams ("Abrams"); Mintz, Fraade & Zeiger, P.C., Frederick M. Mintz and Alan Fraade (the "Mintz Fraade Defendants"); and Stuart Becker and Stuart Becker & Co., P.C. (the "Becker Defendants") (collectively the "Moving Defendants"), have moved to dismiss the second amended consolidated complaint of the plaintiffs in *Morin v. Trupin*, 88 Civ. 5743 (the "Morin action" and the "Morin plaintiffs"), and the second amended complaint in the related action of *Alberti v. Trupin*, 90 Civ. 3475 (the "Alberti action" and the "Alberti plaintiffs"), pursuant to Rules 12(b)(1), 12(b)(6) and 9(b), Fed.R.Civ.P.

The underlying disputes and principal parties which are the subject of these actions are recounted in prior opinions of the court, familiarity with which is assumed. *See, e.g., Morin v. Trupin*, 711 F.Supp. 97 (S.D.N.Y.1989); *Morin v. Trupin*, 728 F.Supp. 952 (S.D.N.Y.1989); *Morin v. Trupin*, 738 F.Supp. 98 (S.D.N.Y.1990); *Morin v. Trupin*, 747 F.Supp. 1051 (S.D.N.Y.1990).

## I. THE ALBERTI ACTION

### A. *Facts*

The Alberti action involves an allegedly unlawful securities offering by defendants Barry Trupin ("Trupin"), Rothschild Reserve International, Inc. ("Rothschild Reserve") and others, including the Moving Defendants. The plaintiffs are fifty three investors in a New York limited partnership known as Sacramento Office Park Associates ("Sacramento Associates"). Sacramento Associates was organized for the stated purpose of acquiring, owning, operating and leasing commercial real property consisting of a two-building office park complex known as the Butano Buildings in Sacramento, California (the "Butano Property"). Plaintiffs allege that in making their investments in Sacramento Associates, they relied upon false and misleading representations contained in the Sacramento Office Park Associates Series Private Placement Memorandum (the "Sacramento PPM"), solicitation letters, and sales and promotional literature (collectively the "Sacramento Offering Materials") and on oral representations by various defendants. The Sacramento Offering Materials allegedly contained misrepresentations regarding the manner in which the Butano Property was acquired for syndication, the value and commercial viability of the Butano Property, the application of the proceeds of the offering of limited partnership interests in Sacramento Associates, and the basis for and availability of the tax benefits described in the Sacramento PPM. All of the plaintiffs in the Alberti action are alleged to have purchased their limited partnership interests in Sacramento Associates by February of 1985. Alberti Comp. ¶ 147.

### B. *Prior Proceedings*

The original complaint in the Alberti action was filed on May 22, 1990. An amended complaint naming an additional eighteen plaintiffs was filed on June 28, 1990. The second amended complaint (the "Alberti complaint"), which is the subject of the

present motions, was deemed filed on February 1, 1991 in response to this court's dismissal of the complaint in the related action of *Morin v. Trupin*, 88 Civ. 5743 and pursuant to an order of this court dated February 20, 1991.

### C. Discussion

#### 1. 10(b) Claims Against all Moving Defendants are Barred by the Statute of Limitations

■ Recently, in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, — U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court recently held that private actions under Section 10(b) of the 1934 Act must be commenced within one year after the discovery of the facts constituting the violation and within three years after such violation. *Id.* 111 S.Ct. at 2781–82. The Supreme Court applied that statute of limitations retroactively to bar a complaint that may otherwise have been timely under prior law. The retroactivity of the *Lampf* rule was confirmed by the Court's subsequent holding in *James B. Beam Distilling Co. v. Georgia*, — U.S. ——, 111 S.Ct. 2439, 2447–48, 115 L.Ed.2d 481 (1991) (when Court applies rule of law to litigants in one case it must do so with respect to all others not barred by procedural requirements or res judicata), and by the Second Circuit in *Welch v. Cadre Capital*, 946 F.2d 185 (2d Cir.1991) (*Lampf* to be applied retroactively to all cases not finally adjudicated on date *Lampf* decided).

The Alberti plaintiffs' 10(b)/10b–5 claims against the Moving Defendants are untimely under *Lampf* and are therefore dismissed. According to the complaint, all of the plaintiffs in the Alberti action purchased their interests in Sacramento Associates by February of 1985. The original complaint in that action was filed on May 22, 1990. Because the Alberti plaintiffs' 10(b)/10b–5 claims against the Moving Defendants are premised on the allegedly fraudulent Sacramento Offering Materials, these claims accrued no later than February of 1985. Therefore, the action was commenced outside of the three-year statute of limitations established in *Lampf*.

Moreover, the Alberti plaintiffs' claim that they did not discover, and indeed could not have discovered, the alleged fraud until August of 1989 does not save their claims under the one-year discovery prong of *Lampf*. *Lampf* specifically rejected the application of equitable tolling principles to the three-year cutoff as "fundamentally inconsistent with the 1–and–3–year structure." *Lampf*, 111 S.Ct. at 2782.

Having thus dismissed the federal securities fraud claims, the following discussion addresses the motions of each Moving Defendant as to the remaining claims against them.

#### 2. Abrams

The Alberti Plaintiffs allege that Abrams violated multiple provisions of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"). In addition, the Alberti complaint asserts a number of pendent claims, including violation of the Blue Sky Laws of ten states, common law fraud, conspiracy to defraud, negligent misrepresentation and breach of fiduciary duty. Because plaintiffs have failed to state a claim for which relief can be granted, their RICO claims against Abrams are dismissed. Because plaintiffs' federal claims against Abrams are hereby dismissed, their state law claims likewise are dismissed for lack of pendent jurisdiction.

#### a. RICO Claims Against Abrams Are Dismissed

In Claims I through V of their complaint, the Alberti plaintiffs assert violations by Abrams of RICO based on his participation in the preparation of the Sacramento PPM and his supervision of the Mintz Fraade Defendants' activities in connection with the Sacramento Offering Materials. Specifically, the Alberti complaint alleges violations of 18 U.S.C. § 1962(a) (use of income or proceeds of income derived directly or indirectly from pattern of racketeering activity in acquisition of interest in or establishment of enterprise engaged in interstate commerce); 18 U.S.C. § 1962(b) (direct or indirect acquisition or maintenance

of interest in or control of enterprise engaged in interstate commerce through pattern of racketeering activity); 18 U.S.C. § 1962(c) (direct or indirect conduct of or participation in conduct of enterprise by person employed by or associated with enterprise engaged in interstate commerce); and 18 U.S.C. § 1962(d) (conspiracy to violate 18 U.S.C. §§ 1962(a)–(c)). The predicate acts allegedly committed by Abrams are securities fraud, mail and wire fraud and fraudulent concealment. *See* Alberti Comp. ¶¶ 272, 288, 294, 299, 306–07.

■ To state a cause of action under RICO, plaintiffs must allege:

(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce.

*Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom.*, *Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Moreover, it is well-settled that where, as here, the predicate crimes of a RICO claim sound in fraud, the pleading of those predicate acts must satisfy the particularity requirement of Rule 9(b), Fed.R.Civ.P. ("Rule 9(b)" or "9(b)"). *See Morin v. Trupin*, 711 F.Supp. 97, 111 (S.D.N.Y.1989) (citing *The Limited, Inc. v. McCrory Corp.*, 645 F.Supp. 1038, 1041 (S.D.N.Y.1986); *Equitable Life Assurance Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y.1985)); *Fidenas AG v. Honeywell, Inc.*, 501 F.Supp. 1029, 1042–43 (S.D.N.Y.1980). The pleading of the predicate crime of mail fraud must also specify the use of the mails or wires. *Frota v. Prudential–Bache Secs., Inc.*, 639 F.Supp. 1186, 1192 (S.D.N.Y.1986). In fact, "all of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions." *Plount v. American Home Assurance Co.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987).

■ Rule 9(b) provides that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge, and other condition of mind of a person may be averred generally." Allegations of fraud thus must specify the fraudulent statement, the time, place, speaker and content of the alleged misrepresentations, *Luce v. Edelstein*, 802 F.2d 49, 54 (2d Cir.1986); *Conan Properties, Inc. v. Mattel, Inc.*, 619 F.Supp. 1167, 1172 (S.D.N.Y.1985); *Quintel Corp., N.V. v. Citibank, N.A.*, 589 F.Supp. 1235, 1243 (S.D.N.Y.1984) (citing, *inter alia, Ross v. A.H. Robins Co.*, 607 F.2d 545, 557 (2d Cir.1979), *cert. denied*, 446 U.S. 946, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980)), and factual circumstances giving rise to a strong inference that the defendant had the requisite fraudulent intent. *Ouaknine v. MacFarlane*, 897 F.2d 75, 80 (2d Cir.1990); *Stern v. Leucadia Nat'l Corp.*, 844 F.2d 997, 1004 (2d Cir.), *cert. denied*, 488 U.S. 852, 109 S.Ct. 137, 102 L.Ed.2d 109 (1988) (although Rule 9(b) provides for general pleading of state of mind, such general pleading must be supported by the allegation of "circumstances ... that provide a factual foundation for otherwise conclusory allegations of scienter"). Under Rule 9(b), the complaint must allege "(1) specific facts; (2) sources that support the alleged specific facts; and (3) a basis from which an inference of fraud may fairly be drawn." *Crystal v. Foy*, 562 F.Supp. 422, 425 (S.D.N.Y.1983).

This court has held that the unamended complaint in the substantially similar case of *Morin v. Trupin* adequately pleaded the existence of two enterprises (as translated here, the Sacramento Enterprise and the Syndication Enterprise) and of the "continuity" necessary to establish a "pattern" of racketeering activity. *Morin v. Trupin*, 747 F.Supp. 1051, 1066 (S.D.N.Y.1990). In the same opinion, the court held, however, that the unamended complaint failed to plead with the requisite particularity:

the relation of individual defendant to predicate act and to the conduct supporting ascription of such act to the defendant. As pleaded, it is simply too difficult a task to determine the specific predicate acts each defendant is charge with

committing (or aiding and abetting) and which factual allegations establish their connection to such predicate acts. *Id.* at 1065. More specifically, the opinion in *Morin* demanded that the amended complaint plead the "time, place, speaker and content of the alleged misrepresentations" as required in *Luce v. Edelstein,* 802 F.2d at 54, "a sufficient showing of fraudulent intent," and, with respect to the charges of mail fraud, the specifics of the use of the mails and wires. *Id.* at 1065–66 n. 8.

The Alberti complaint does not plead Abrams's commission of at least two predicate acts in the manner contemplated by *Morin.* The Alberti complaint alleges that through his preparation of sections of the Sacramento PPM and his supervision of the Mintz Fraade Defendants in connection with their preparation of the Sacramento Offering Materials Abrams committed securities fraud under § 10(b) and Rule 10b–5, mail and wire fraud and fraudulent concealment. The following paragraphs of the Alberti complaint specifically address Abrams.

62. Defendant Robert D. Abrams ("Abrams") resides in New York, New York. Abrams was an in-house lawyer for the entities within the Rothschild Group, participated in the preparation of the Sacramento Associates Private Placement Memorandum and was responsible for supervising and directing the activities of defendants Mintz, Fraade & Zeiger, P.C., Frederick M. Mintz and Alan Fraade in connection with the Sacramento Associates offering.

156. Abrams was an in-house attorney for each of the Rothschild Group entities involved in the Sacramento Associates Offering. Abrams supervised the Mintz Fraade defendants' services in connection with the Sacramento Associates Private Placement Memorandum and participated in the drafting of the Terms of the Offering, the Summary of the Offering and the Business of the Partnership sections.

246. Barry and Bennet Trupin agreed with Rogers in approximately November 1986 that Rogers would assume responsibility for Sacramento Associates and the Butano Property. Trupin, with the assistance of Abrams, personally negotiated and implemented the transfer of control to Rogers.

278. ... Abrams is liable for establishing the Sacramento Enterprise because he was a controlling person of Rothschild Reserve and gave legal advice regarding the structure of the Sacramento Associates syndication.

### 10(b) Claim

■ To state a cause of action under § 10(b) and Rule 10b–5, the complaint must allege with particularity (1) a misstatement or omission by the defendant; (2) as to a material fact; (3) upon which plaintiff relied; (4) and which caused plaintiff to suffer damages. In addition, the plaintiff must show that (5) defendant acted with scienter; and that (6) the misstatement or omission was made in connection with the purchase or sale of securities. *See In re Columbia Secs. Litig.,* 747 F.Supp. 237, 240–41 (S.D.N.Y.1990). Because the Alberti complaint fails to do so, the alleged 10(b) violation cannot be asserted as a predicate act.

Although the identification of alleged misrepresentations in offering materials, such as the Sacramento PPM in which Abrams allegedly participated in preparing, has been held to satisfy the "when, where, and what" prongs of that rule, *see Luce,* 802 F.2d at 55; *see also Morin,* 747 F.Supp. at 1061 (second amended complaint must meet this requirement), Rule 9(b) requires that all defendants be apprised of the nature of their alleged participation in the fraud individually, except those defendants who are "controlling persons" or "insiders," as to whom the Rule's stringency is relaxed. *Di Vittorio v. Equidyne Extractive Indus., Inc.,* 822 F.2d 1242, 1247 (2d Cir.1987); *Quintel,* 589 F.Supp. at 1243. Indeed, in dismissing the complaint in *Morin,* this court required that, in repleading the complaint, the plaintiffs must "establish[ ] a sufficient nexus between an individual defendant and the memorandum in the manner contemplated by the noted case law." *Morin,* 747 F.Supp. at 1062.

Despite their conclusory allegation that Abrams is a "controlling person," *see, e.g.,* Alberti Comp. ¶ 278, the Alberti plaintiffs have failed to plead facts that establish such a status. *See Morin,* 747 F.Supp. at 1061 ("As to any defendant to whom cannot fairly be ascribed insider or affiliate status, a more precise connection to, or role in preparation of, the Memorandum must be pleaded to sustain a claim against Rule 9(b) challenge."). Instead, they balance this conclusion on Abrams's position as in-house counsel to entities in the Rothschild Group. However, the cases they cite (enigmatically) as authority for equating the roles of in-house counsel and "controlling persons" indicate that the Alberti plaintiffs have not alleged sufficient facts to support their characterization of Abrams. *See, e.g., Steinberg v. Illinois Co.,* 659 F.Supp. 58, 61 (N.D.Ill.1987) (account executive could be controlling person because complaint alleged he had ability to influence brokerage firm); *In re Diasonics Secs. Litig.,* 599 F.Supp. 447, 459–60 (N.D.Cal.1984) (officers liable as controlling persons if in position to assert influence and control); *Westlake v. Abrams,* 504 F.Supp. 337, 349–50 (N.D.Ga.1980) (to be controlling person must be involved in day-to-day operations of offering entity). Nowhere does the Alberti complaint allege that Abrams exercised influence over, participated in the day-to-day operations of, or was a principal of Sacramento Associates.

Thus, the many paragraphs of the Alberti complaint implicating Abrams in the allegedly fraudulent scheme, either by name as one of multiple defendants or under the general term "defendants," do not satisfy 9(b) because they fail to inform Abrams of the nature of his alleged participation in the fraud. *See Di Vittorio,* 822 F.2d at 1247. The four paragraphs addressed specifically to Abrams also fail under the standards of 9(b).

While the Alberti complaint as a whole does identify the allegedly misleading statements and when they were made, it does not adequately plead a connection between Abrams and these statements. The complaint alleges that Abrams "participated" in drafting the "Terms of the Offering," "Summary of the Offering" and "Business of the Partnership" sections of the Sacramento PPM and "supervis[ed] and direct[ed]" the activities of the Mintz Fraade Defendants in connection with the Sacramento Offering Materials. Alberti Comp. ¶¶ 62, 156. Nevertheless, the Alberti complaint does not allege that any false statements appeared in the sections allegedly drafted by Abrams. Plaintiffs erroneously cite this court's opinion in *Bruce v. Martin,* 691 F.Supp. 716, 722 (S.D.N.Y.1988), claiming that they need not further particularize Abrams's responsibility for misrepresentations because where allegations of fraud relate to a group product, "specific allegations as to each [defendant] are unnecessary." The rule articulated in *Bruce,* however, applies only where the defendant is a controlling person, *see id.,* which Abrams is not. *See supra.*

The Alberti complaint's primary failing with respect to its allegations of 10(b) violations against Abrams is that it does not set forth a "factual basis for [plaintiffs'] conclusory allegations" that Abrams knew that any of the alleged misstatements were fraudulent that "give[s] rise to a strong inference" that he did. *See Ross v. A.H. Robins Co.,* 607 F.2d 545, 558 (2d Cir.1979). In their memorandum in opposition to the present motion, the Alberti plaintiffs contend that their complaint's allegation that Abrams was an in-house attorney for the various entities involved in the syndication gives rise to an inference that he was "well aware of the factual misrepresentations in these materials."

Abrams was not an insider of the Rothschild Group or Sacramento Associates, and his knowledge cannot be inferred solely from the fact that he served as assistant in-house counsel for the entities involved in the syndication. *See Morin v. Trupin,* 711 F.Supp. at 110 ("merely alleging that a professional has performed services for other defendants is an insufficient basis for inferring scienter"); *Dannenberg v. Dorison,* 603 F.Supp. 1238, 1241 (S.D.N.Y.1985) (same); *cf. The Limited, Inc. v. McCrory Corp.,* 683 F.Supp. 387, 394 (S.D.N.Y.1988)

(role as auditor does not imply scienter). Moreover, simply reciting the talismanic formula that "these defendants ... willfully, knowingly or recklessly intended that plaintiffs and other investors would rely thereon in purchasing the Sacramento Associates Limited Partnership interests," *see e.g.*, Alberti Comp. ¶ 314, does not constitute an adequate pleading of scienter. The Alberti complaint fails to specify how or when Abrams became aware of facts that made the Offering Materials misleading. Because Abrams's scienter has not been properly pleaded, the 10(b) claim cannot be asserted as a predicate act under RICO.

### Mail and Wire Fraud Claim

■ To establish that a defendant has committed an indictable offense under the federal mail and wire fraud statutes, a plaintiff must allege and prove "(1) the existence of a scheme to defraud, and (2) the use of the mails or interstate wires in furtherance of the fraudulent scheme." *In re Gas Reclamation, Inc., Secs. Litig.*, 659 F.Supp. 493, 512 (S.D.N.Y.1987) (citations omitted). Mail and wire fraud must be pleaded in conformity with Rule 9(b). *Rich–Taubman Assocs. v. Stamford Restaurant Operating Co.*, 587 F.Supp. 875, 878 (S.D.N.Y.1984).

■ Because the mail and wire fraud claims premised on inadequately pleaded securities fraud violations must be dismissed, *see Bresson v. Thomson McKinnon Secs., Inc.*, 641 F.Supp. 338, 348 (S.D.N.Y.1986), the Alberti plaintiffs claims of mail fraud based on misrepresentations in the PPM cannot constitute a predicate act here. The Alberti plaintiffs also claim, however, that Abrams and other defendants committed mail fraud by concealing the status of Sacramento Associates and the Butano Property after obtaining the Alberti plaintiffs' investments in the limited partnership, Alberti Comp. ¶¶ 258–61, 288, and by assisting Trupin in negotiating and implementing the transfer of control over Sacramento Associates to Gary Rogers ("Rogers") in 1986. Alberti Comp. ¶¶ 246–52, 288. This claim fails to satisfy Rule 9(b), as set forth below.

First, although the Alberti plaintiffs list a number of letters that allegedly comprise "indictable acts of mail fraud" designed to conceal the status of Sacramento Associates and the Butano Property, they do not even purport that Abrams himself was responsible for any of them. Alberti Comp. ¶ 259 (enumerating letters from Rothschild Registry, Rothschild Reserve, and Marvin Schaffer). As discussed above, even though Abrams was in-house counsel to the Rothschild Group entities, the letters from Rothschild Registry and Rothschild Reserve cannot be imputed to Abrams because he is not a controlling person. Likewise, the paragraphs of the Alberti complaint addressing the transfer of control of Sacramento Associates to Rogers are completely devoid of any particular reference to acts by Abrams.

Even if this claim was properly pleaded against Abrams, however, it could not stand as a RICO predicate act because the complaint does not sufficiently allege that the Alberti plaintiffs were "injured in [their] business or property by reason of a violation of Section 1962." 18 U.S.C. § 1964(c). The injury allegedly suffered by the Alberti plaintiffs consists of the amounts invested in Sacramento Associates and amounts incurred by reason of any adverse tax consequences resulting from the investments. *See* Alberti Comp. ¶ 389. Any damage leading to these alleged injuries was done as of the date the Alberti plaintiffs were induced to purchase limited partnership interests. The letters and the transfer of control of Sacramento Associates all post-date this event.

Because the Alberti complaint fails to plead successfully two or more predicate acts constituting a "pattern of racketeering activity" by Abrams, the RICO claims against him are dismissed.

#### b. *State Law Claims*

The Alberti plaintiffs also have asserted claims of common law fraud, state law securities violations, negligent misrepresentation and breach of fiduciary duty against Abrams. Because the federal claims against Abrams conferring jurisdic-

tion on this court are hereby dismissed, to the extent that the issues discussed herein would not independently dispose of the pendent claims, they are dismissed for lack of pendent jurisdiction. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966).

### c. *Rule 11 Sanctions*

Abrams has moved for an award of sanctions under Rule 11, Fed.R.Civ.P. Rule 11 requires an attorney to make a "reasonable inquiry" to determine that pleadings and motions are "well grounded in fact" and "warranted by existing law" or constitute "a good faith argument for the extension, modification, or reversal of existing law," and that they are not interposed for the purpose of harassment or delay. According to the Court of Appeals for the Second Circuit, "[i]f the inquiry was objectively reasonable under the circumstances and disclosed a reasonable factual basis for the claim, then sanctions are not appropriate." *Calloway v. Marvel Entertainment Group,* 854 F.2d 1452, 1470 (2d Cir.1988), *rev'd in part sub nom. Pavelic & Leflore v. Marvel Entertainment Group,* 493 U.S. 120, 110 S.Ct. 456, 107 L.Ed.2d 438 (1989), *on remand sub nom. Calloway v. Marvel Entertainment Group,* 907 F.2d 145 (2d Cir.1990). Nothing in the facts indicates that the Alberti plaintiffs (or the Morin plaintiffs, see below) have failed to make an objectively reasonable inquiry into the basis of their claims. Thus, Abrams's motion for Rule 11 sanctions is denied.

### 3. The Mintz Fraade Defendants

The Alberti complaint charges the Mintz Fraade Defendants with violations of RICO, violations of Section 10(b) and Rule 10b–5, violations of state securities laws, common law fraud, negligent misrepresentation, legal malpractice and breach of fiduciary duty. Because the 10(b) claim is hereby dismissed as untimely, the following discussion relates to the remaining claims.

### a. *RICO Claims*

The Alberti complaint charges the Mintz Fraade Defendants with violating 18 U.S.C. §§ 1962(a)–(d), claiming as predicate acts the securities frauds set forth in paragraphs 166 through 237, the "multiple acts of indictable mail fraud" set forth in paragraphs 147 through 237, and the acts of fraudulent concealment set forth in paragraphs 246 through 261. Because the Alberti complaint fails to plead with particularity at least two predicate acts by the Mintz Fraade Defendants, the RICO claims are dismissed.

### 10(b) Claim

The complaint alleges that the Mintz Fraade Defendants are liable under 10(b) for the following acts:

335. The Mintz Fraade Defendants intentionally caused the following material misrepresentations in and omissions from the Sacramento Associates Private Placement Memorandum with the specific intention that plaintiffs would rely on them:

(a) The false and/or misleading tax opinions and tax information described in paragraphs 211–216;

(b) The false and/or misleading representations that North American and Stern were independent of and not affiliated with the Rothschild Group;

(c) The material omission of the negative IRS audit history of prior tax shelters organized and promoted by the Rothschild Group, as set forth in paragraphs 167–169;

(d) The false and misleading statements regarding the manner in which the Butano Property was acquired, as set forth in paragraphs 171–180.

336. Specifically, the representations by the Mintz Fraade Defendants were intentionally false because the Mintz Fraade Defendants knew that: (i) the assumptions purportedly underlying the Financial Projections and the information contained in the schedules was not accurate; (ii) the Butano Property was far less valuable than the amounts reflected in the appraisal letters; and (iii) the persons affiliated with the Rothschild Group had included numerous false and misleading

statements in the Sacramento Associates Private Placement Memorandum.

337. As attorneys for SRC, Sacramento Associates, and North American, the Mintz Fraade Defendants also knew or should have known that these purported transactions involving North American had not occurred but were designed to fraudulently conceal that the price paid for the Butano Property was significantly in excess of fair market value or the actual arm's-length acquisition price in order (i) to fraudulently inflate the disclosed acquisition price of the Butano Property and (ii) to create a fraudulently inflated basis for the interest deductions and the depreciation deductions disclosed in the Sacramento Associates Private Placement Memorandum.

The cross-referenced paragraphs in turn provide that:

167. The Sacramento Associates Private Placement Memorandum failed to disclose any material information concerning (i) the background of the actual promoters and sponsors of the Sacramento Associates Offering, *i.e.*, Barry Trupin, Rothschild Reserve and the other persons and entities affiliated with the Rothschild Group and (iii) the prior audit history of the tax shelter investments sponsored by the Rothschild Group.

168. At the time of the Sacramento Associates Offering, many tax-shelter entities previously organized and promoted by the Rothschild Group had been audited by the IRS and additional audits were in progress. These audits resulted in disallowing tax deductions based on investments in the Rothschild Group's tax shelters and, since the early 1980's, the IRS had adhered to the routine policy of disallowing tax deductions based on investments organized and promoted by the Rothschild Group.

169. The adverse audit history of prior Rothschild Group tax shelters was known to all defendants participating in the preparation of the Sacramento Associates Private Placement Memorandum but concealed from prospective investors. Instead, the Sacramento Associates Private Placement Memorandum contained the misleading statement that each of the six real estate tax shelters and four equipment leasing tax shelters that had been sponsored by MHT Corp. or its affiliates since July 1983 had met its material obligations as set forth in the private placement memorandum for each. In fact, the IRS had repeatedly determined, all Rothschild Group tax shelters had been funded on unrealistic economic assumptions which precluded them from sustaining IRS scrutiny.

171. According to the Sacramento Associates Private Placement Memorandum, the Butano Property was to be acquired from a third-party seller ("the initial seller") by defendant SRC.

172. The terms of SRC's $11,250,000 acquisition were disclosed in the Sacramento Associates Private Placement Memorandum as follows: (a) $100,000 paid as a cash deposit to the initial seller; (b) $6,369,000 representing the net proceeds of a loan from a lender, which was referred to in the private placement memorandum as the "First Deed of Trust Lender"; this loan was secured by a mortgage....

173. According to the Sacramento Associates Private Placement Memorandum, SRC, in turn, would sell the Butano Property to defendant North American which the Sacramento Associates Private Placement Memorandum described as independent of all other entities and persons involved in either the transaction or the Sacramento Associates Offering....

174. According to the private placement memorandum, North American would then sell the Butano Property to Sacramento Associates with Sacramento Associates paying the $12,900,000 purchase price in the following manner: (a) $1,290,000 in cash at the closing and (b) the balance of $11,610,000 pursuant to a purchase money not (the "Sacramento Associates Wrap–Around Note") which, according to the private placement memorandum, would be inclusive of and wrap around both the First Deed of Trust and the Second Deed of Trust until December 31, 1990.

175. The Sacramento Associates Private Placement Memorandum represented that (i) the purported sale of the Property from the initial seller to SRC, (ii) the purported sale of Property from SRC to North American and (iii) the purported sale of the Property from North American to Sacramento Associates would all close simultaneously on December 18, 1984.

176. The following representations contained in the Sacramento Private Placement Memorandum regarding the manner in which the Butano Property were false in the following respects:

(a) The actual price at which Sacramento Associates acquired the Butano Property ...;

(b) No entity with the name SRC was involved in any way with the acquisition of the Butano Property....

(c) SRC was, in fact, an entirely fictional entity;

(d) No entity with the name North American was involved in any way with the acquisition of the Butano Property....

(e) North American was actually affiliated with the Rothschild Group, specifically;

(i) Stuart Stern, the principal of North American, was a boyhood friend of Barry Trupin, a former taxi driver with no significant business background, and subject to Barry Trupin's immediate control and an employee of various entities within the Rothschild Group.

(ii) The Sacramento Associates Private Placement Memorandum indicates that the Mintz Fraade Defendants, who were the attorneys for the Rothschild Group entities involved in the acquisition of the Butano Property, also acted as attorneys for North American.

(iii) On December 30 and 31, 1986, Barry Trupin misappropriated the proceeds of the unauthorized and undisclosed refinancing of the underlying mortgage debt on the Sacramento Property by means of a ... wire trans-

fer from United First Federal Bank Building Partnership to North American....

(iv) In May 1987 defendant Alan Fraade informed defendant Gary Rogers that North American was not, in fact, an independent entity but, instead, actually affiliated with and controlled by the Rothschild Group....

(f) Because North American was not an independent entity, neither its purported acquisition of the Butano Property from SRC nor its purported sale of the Property to Sacramento Associates could have been, if not entirely fictional, an arms-length transaction or a transaction of any real economic substance.

177. As set forth in the Sacramento Private Placement Memorandum, the sale of the Property from the initial seller to SRC, the sale from SRC to North American Realty ... and the sale from North American to Sacramento Associates ... occurred simultaneously on December 18, 1984.

178. In fact, the title documents indicate that Sacramento Associates took title directly from the initial seller, confirming that the purported transactions involving North American were entirely fictional.

179. Defendants failed to disclose, either in the Offering Materials or elsewhere, that the transactions involving SRC and North American were, in fact, entirely fictional or at best only paper transactions lacking in economic substance....

180. Because the transactions described in the Sacramento Associates Private Placement Memorandum regarding the manner in which Sacramento Associates acquired the Butano Property did not actually occur, and even if they had occurred, would not have had an economically substantial basis, the Sacramento Associates Wrap–Around Note did not represent a genuine obligation to North American. For this reason, contrary to the representations in the Sacramento Associates Private Placement Memorandum, (i) the accrued portion of the interest in the Sacramento Associates Wrap–

Around Note was not deductible and (ii) the fraudulently inflated acquisition price for the Butano Property disclosed in the Sacramento Associates Private Placement Memorandum did not support the disclosed depreciation deductions.

211. The tax opinions prepared by the Mintz Fraade Defendants that were included in the Sacramento Associates Private Placement Memorandum concluded that the tax benefits described in that private placement memorandum were more likely than not to be realized because:

(a) the possibility of substantial profits to investors apart from the claimed tax benefits existed;

(b) the entities rendering the appraisals had no personal interest in or bias regarding the subject matter of the appraisals or the persons involved in the offering;

(c) the Sacramento Associates Limited Partnership would be deemed to be engaged in activity for the purpose of deriving a profit since the expected tax benefits were less than the investment in the Sacramento Associates Limited Partnership; and

(d) the purchase of the Butano Property by Sacramento Associates from North American constituted a sale for federal income tax purposes.

212. These assumptions were false and contradicted by information known to the Mintz Fraade Defendants at the time they prepared the tax information contained in the Sacramento Associates Private Placement Memorandum. Specifically:

(a) Based on their role as attorneys for SRC North American and Sacramento Associates, the Mintz Fraade Defendants knew that:

(i) the Butano Property had been acquired by Sacramento Associates directly from the Benvenutis at an arms-length price which was materially less than the price described in the Sacramento Associates Private Placement Memorandum as the price paid by the Sacramento Associates Limited Partnership;

(ii) as confirmed by Alan Fraade's disclosures to Gary Rogers in 1987, North American was affiliated with the Rothschild Group; and

(iii) the purported acquisition of the Butano Property by the Sacramento Associates Limited Partnership from North American did not constitute a sale for tax purposes;

(b) Based on their representation of the Rothschild Group in prior commercial real estate limited partnership offerings, the Mintz Fraade Defendants were aware that Jackson–Cross had prepared other appraisals for properties syndicated by the Rothschild Group and had an interest in maintaining its long term relationship with the Rothschild Group; and

(c) Based on their representation of the entities comprising the Rothschild Group, the Mintz Fraade Defendants knew that the IRS had routinely disallowed tax deductions in tax shelters promoted by the Rothschild Group which involved similarly structured acquisition and finance arrangements.

213. The Mintz Fraade Defendants knew that North American was affiliated with the Rothschild Group, that the Sacramento Associates Wrap–Around Note was not negotiated in arms-length transactions and that the 18 percent per annum interest, compounded monthly, on the Sacramento Associates Wrap–Around Note exceeded commercially reasonable rates. Nevertheless, the Mintz Fraade Defendants misrepresented in their tax opinions that it was more likely than not:

(a) that the initial tax basis for the Sacramento Associates Limited Partnership would include the Sacramento Associates Wrap–Around Note and that the Sacramento Associates Wrap–Around Note supported the depreciation deductions described in the Sacramento Associates Private Placement Memorandum;

(b) that Sacramento Associates would be able to deduct the interest on the Sacramento Associates Wrap–Around Note and that the Sacramento Associates Wrap–Around Note supported the interest deductions described in the Sacramento Associates Private Placement Memorandum; and

(c) that neither MHT, Mellon, North American nor the affiliates of these entities would be treated as a partner or joint venturer with the Sacramento Associates Limited Partnership.

214. The Mintz Fraade Defendants knew that the purported fees and expenses described in the Sacramento Associates Private Placement Memorandum did not represent fair market values for any services performed or were for services which would never be performed. Nevertheless, the Mintz Fraade Defendants represented that it was more likely than not that these fees would be included as expenses or as capitalized costs in the initial tax basis of the Sacramento Associates Limited Partnership.

215. The Mintz Fraade Defendants also represented in the tax opinions contained in the Sacramento Associates Private Placement Memorandum that it had complied with Formal Opinion 346 issued by the ABA Standing Committee on Ethics and Responsibility ("ABA Opinion 346"). ABA Opinion 346 specifies that attorneys cannot ignore obvious discrepancies; that an attorney who bases an opinion on information provided by a promoter when the attorney knows that further inquiry would contradict this information gives a false opinion; that it is dishonest to recklessly disregard information indicating that the assumptions a tax shelter opinion is based upon are false or misleading; and that if the client gives incomplete or inconsistent information, the attorney must make further inquiry.

216. In its tax opinions included in the Sacramento Associates Private Placement Memorandum the Mintz Fraade Defendants either (i) represented that they had complied with the due diligence requirements set forth in ABA Opinion 346 when they had not or (ii) learned that the material assumptions underlying the tax opinions were false and, nevertheless, falsely opined that the described tax benefits were more likely than not to be realized.

■ Broken down, these paragraphs appear to allege six misrepresentations for which the Mintz Fraade Defendants are responsible. These representations pertain to (1) the manner in which the Butano Property was acquired; (2) the availability of interest deductions based on the interest rate on the purportedly genuine obligation represented by the Wrap–Around Note to North American; (3) the lack of a requirement to pay interest on the Wrap Around Note on a current basis; (4) the arm's-length nature of the transaction between North American and Sacramento Associates; (5) the omission of the negative audit history of past Rothschild Group syndications; and (6) the deductibility or capitalizability of various management and consulting expenses. Some of these allegations do pass muster under Rule 9(b).

The Alberti complaint adequately pleads misrepresentations in the Mintz Fraade Defendants' tax opinions as to the manner in which the Butano Property was acquired. The Alberti complaint identifies specific facts, sources for those facts and a basis from which an inference of fraud can be drawn that the Mintz Fraade Defendants misrepresented that North American was an interim buyer and seller of the Butano Property. *See Crystal,* 562 F.Supp. at 425.

Paragraphs 171 through 175 cite representations contained in the Sacramento PPM that the Butano Property was acquired by Sacramento Associates after a series of transfers through other buyers and sellers during the course of which the price of the Butano Property became inflated. Paragraphs 176 and 178 allege that these representations were false, citing as a source for this accusation the title documents, which evidence that title passed directly from the initial seller to Sacramento Associates. Paragraph 173 alleges that the Mintz Fraade Defendants had served as counsel for both the Rothschild Group enti-

ties and North American, as represented in the Sacramento PPM itself.

These allegations give rise to a "strong inference" that the Mintz Fraade Defendants were aware that several representations in the Sacramento PPM were false. First, Mintz Fraade's representation of North American at the time of the Sacramento PPM gives rise to the inference that they knew that North American played no part in the chain of sale of the Butano Property. This inference in turn gives rise to the inference that they knew that the Sacramento PPM's representation as to the price purportedly paid by Sacramento Associates for the Butano Property was not bona fide and therefore a not a proper basis on which to calculate tax benefits. Second, the Mintz Fraade Defendant's awareness that North American was not an interim buyer and seller gives rise to the inference that they knew that the Wrap-Around Note was not a genuine obligation and therefore not properly includible in the tax basis for Sacramento Associates or in any determinations for tax benefits.

■ As for the allegation that the Mintz Fraade Defendants are responsible for the alleged misrepresentation in the Sacramento PPM that North American was not an independent entity, the pleading fails to satisfy the requirements of 9(b). Plaintiffs have not pleaded facts indicating that indeed North American was not an independent entity at the time of the Sacramento PPM. Fraade's untemporalized representation to Rogers in May of 1987 that North American was affiliated with the Rothschild Group cannot serve to validate the conclusion that it was not an independent entity at the time of the Sacramento PPM in 1985.[1] Finally, the complaint fails to particularize facts from which the Mintz Fraade Defendants' scienter can be inferred. Again, Fraade's 1987 statements do not relate back to imply scienter as of the time of the Sacramento PPM.

■ With respect to the allegation regarding the omission of negative audit his-

tory, even assuming that this would be a material misrepresentation, the Alberti complaint fails to plead the source supporting this allegation, as required by 9(b). Rather, it merely states that the IRS had audited prior tax shelters promoted by Rothschild Group entities, disallowed tax deductions based on those investments, and that the IRS had "repeatedly determined, all Rothschild Group tax shelters had been funded on unrealistic economic assumptions." Moreover, aside from the conclusory allegation that "[t]he adverse audit history of prior Rothschild Group tax shelters was known to all defendants participating in the preparation of the" Sacramento PPM and that the Mintz Fraade Defendants had a longstanding professional relationship with the Rothschild Group, the Alberti Complaint alleges no facts from which it can be inferred that the Mintz Fraade Defendants were aware of this allegedly negative audit history. *See Dannenberg*, 603 F.Supp. at 1241.

In sum, the Alberti complaint adequately pleads primary wrongdoer securities fraud under Rule 10(b) by the Mintz Fraade Defendants with respect to some of its allegations. Therefore, this alleged violation may stand as a RICO predicate act.

### Mail Fraud Claim

■ The Alberti complaint alleges that the Mintz Fraade Defendants committed mail fraud as pleaded in paragraphs 147–237. The only reference to use of the mails in these paragraphs which could possibly be attributed to the Mintz Fraade Defendants appears in paragraph 148, which alleges that:

148. The sales of the Sacramento Associates limited partnership units were promoted, *inter alia*, by distributing to the investing public, by means of the United States mail, the Offering Materials including the Sacramento Associates Private Placement Memorandum, the supplement, the question and answer sheet and a broker/dealer fact sheet.

---

**1.** In any case, if it is true, as alleged in the Alberti complaint, that North American was never involved in the chain of sale of the Buta-

no Property, the status of North American would not be material.

Rule 9(b) requires that the complaint "allege the specifics of any use of the mails or wires." *Frota*, 639 F.Supp. at 1192. Considering the sheer number of plaintiffs involved in this action, the mere statement that the limited partnership was promoted by means of distributions through the United States mails is overly vague.

### Fraudulent Concealment

[16] Paragraphs 246–71 set forth the acts constituting the alleged fraudulent concealment by defendants of the transfer of control of Sacramento Associates and of the condition and economic viability of the Butano Property. Nevertheless, as with Abrams, these paragraphs are completely devoid of any specific reference to acts by the Mintz Fraade Defendants with the exception of one paragraph:

> 258. Immediately after obtaining plaintiffs' investments in Sacramento Associates, defendants embarked on a campaign to fraudulently conceal the misrepresentations . . . .

The Mintz Fraade Defendants are not insiders, and therefore this generalized reference to "defendants" cannot capture them under its umbrella. Because the allegations of fraudulent concealment by the Mintz Fraade Defendants do not meet the particularity requirement of Rule 9(b), fraudulent concealment does not constitute a predicate act.

As the foregoing discussion demonstrates, the Alberti complaint fails to establish the commission of at least two predicate acts by the Mintz Fraade Defendants that form a pattern of racketeering activity. For this reason, the RICO claim against these defendants is dismissed. For the reasons cited above with respect to the state claims against Abrams, the pendent claims against the Mintz Fraade Defendants also are dismissed.

### 4. The Becker Defendants

#### a. *RICO Claims*

##### 10(b) Claim as a Predicate

The Alberti complaint claims that the Becker Defendants committed primary violations of § 10(b) and Rule 10b–5 by (1) making false and misleading statements in the Sacramento PPM regarding prospective financial information and (2) soliciting prospective investors by preparing a letter reviewing the prospective financial information contained in the Sacramento Associates Private Placement Memorandum in which they failed to disclose that Barry Trupin was responsible for the Sacramento Associates Offering and that Stuart Becker & Co. had received illegal bribes and sales commissions from the Rothschild Group for each investor they successfully solicited to participate. The Alberti complaint also alleges that the Becker Defendants aided and abetted the primary 10(b) violations of the other defendants through their solicitation of prospective investors.

The relevant paragraphs of the Alberti complaint provide:

> 185. The prospective financial information included in the Sacramento Associates Private Placement Memorandum consisted of (i) a review letter dated October 15, 1985 (the "October 15, 1984 Becker review letter") prepared by Stuart Becker & Co. and Becker (ii) "Financial Projections" and "Schedules" which contained prospected financial information and, according to the October 15, 1984 review letter, had been prepared by Stuart Becker & Co. and Becker based on information and assumptions which had been provided by MHT Properties, the general partner for the Sacramento Associates Limited Partnership; (iii) "Assumptions" which, according to the October 15, 1984 review letter, had been assembled by Stuart Becker & Co. and Becker in the form they appeared in the Sacramento Associates Private Placement Memorandum and were based upon material furnished by MHT Properties and (iv) "Notes" which, according to the October 15, 1984 review letter, had been assembled by Stuart Becker & Co. and Becker in the form they appeared in the Sacramento Associates Private Placement Memorandum and contained information which had been provided by MHT Properties Corp.

186. The prospective financial information indicates that the Financial Projections and Assumptions were to be read in conjunction with the Notes and that the Notes were an integral part of the Financial Projections and Assumptions.

187. Prior to the Sacramento Associates Offering, Stuart Becker & Co. and Becker had a long-term relationship with the Rothschild Group which included preparing prospective financial information for previous tax shelter offerings permitted by the Rothschild Group and performing audits of equipment leasing and real estate tax shelters sponsored by the Rothschild Group. In particular, Stuart Becker & Co. and Becker prepared, reviewed and assembled prospective information and prepared a review letter in connection with a syndication of the United Federal Bank Building in Sarasota, Florida which was based on many fraudulent misrepresentatives to prospective investors including, *inter alia,* a fraudulent intention of the actual prior paid for the United Federal Bank Building by an amount in excess of at least $5 million.

188. The Financial Projections and Assumptions included: (i) a projected schedule of taxable income or loss for November 1, 1984 through December 31, 2002; (ii) a projected schedule of cash flow for November 1, 1984 through December 31, 2002; (iii) a projected analysis of program benefits ... for November 1, 1984 through December 31, 2002; (iv) a projected analysis of cumulative program benefits ...; (v) a projected sale analysis for December 31, 2002; (vi) a projected schedule of investment benefits ...; (vii) a projected analysis of cumulative investment benefits ...; (viii) a projected analysis of reinvestment benefits ...; (ix) a projected analysis of cumulative reinvestment benefits....

189. In the October 15, 1984 review letter Stuart Becker & Co. and Becker stated that these financial projections were based upon estimates, assumptions and projections provided by MHT Properties, the general partner of the Sacramento Associates Limited Partnership.

190. The October 15, 1984 review letter also falsely represented and opined that the review performed by Stuart Becker & Co. and Becker included the comparison of the Assumptions and the Notes which had been selected for inclusion in the Sacramento Associates prospective financial information with other information that had been provided to Stuart Becker & Co. and Becker and that this comparison verified the accuracy of the Assumptions and Notes.

191. The October 15, 1984 review letter also falsely represented and opined that the review performed by Stuart Becker & Co. and Becker verified that the Financial Projections and the information contained in the schedules had been accurately based on the Assumptions and the information contained in the Notes.

192. The October 15, 1984 review letter also falsely represented and opined that the Financial Projections and the information contained in the Schedules reflected, accounted for and gave effect to the Assumptions and the information contained in the Notes.

193. The October 15, 1984 review letter represented that Stuart Becker & Co. and Becker had selected, from the information and assumptions that had been provided to them by MHT Properties, the information and those assumptions they deemed significant for inclusion in the Assumptions and the Notes set forth in the Sacramento Associates Private Placement Memorandum.

194. The AICPA guidelines applicable to the review of prospective financial information as of 1984 require the accountant to perform procedures he considers necessary to opine regarding whether the assumptions provide a reasonable basis for management's forecasts. The AICPA guidelines also require the accountant to evaluate whether the assumptions are suitably supported. The AICPA guidelines further require the accountant to assess whether sufficient pertinent sources of information about the assumptions have been considered and specifies both the type of external

sources ... and internal sources ... that are appropriate sources of information.

195. In the October 15, 1984 review letter Stuart Becker & Co. and Becker falsely represented that the Financial Projections were based on reasonable and realistic assumptions.

196. In the October 15, 1984 review letter Stuart Becker & Co. and Becker falsely represented that the Assumptions and Notes provided a reasonable basis for each of the Financial Projections.

197. Stuart Becker & Co. and Becker knew that the Financial Projections were materially false; based on false, inaccurate and unrealistic assumptions; intentionally did not account for actual transactions or accurate economic data; and were purposefully designed to mislead investors.

198. Stuart Becker & Co. and Becker knew that the Financial Projections and the Assumptions did not accurately reflect the judgment and knowledge of MHT Properties but instead (i) that the Financial Projections were false and not based on the Assumptions or Notes and (ii) that the Assumptions and Notes were likewise false.

199. Specifically, the Financial Projections were based on false assumptions regarding future income which was not supported by the leases in place at the Butano Property and excessive per annum increases in rent revenue which were entirely unreasonable and contradicted by economic reality.

200. The information contained in the Assumptions and Notes ... was ... entirely false; moreover, accurate information was readily available from both external and internal sources. Therefore, either (i) Stuart Becker & Co. and Becker did not undertake procedures necessary under the AICPA guidelines ... or (ii) Stuart Becker & Co. and Becker did undertake procedures necessary under the AICPA guidelines ..., learned that they were materially false and inaccurate and; nevertheless, falsely represented that the Assumptions and Notes were not contradicted by known information.

201. The Assumptions and Notes were false and unreasonable and were contradicted by information which was known to Stuart Becker & Co. and Becker. Specifically, [they] knew that the following ... were false: (a) that the arm's-length acquisition price paid for the Butano Property was $12,900,000; (b) that all tenants, including the Pacific Telephone and Telegraph Company would renew their leases; (c) that rental income would increase annually at a compounded rate of 8 percent per year until the year 2002; (d) that operating expenses for the Butano Property in 1984 were only $100,000 and would increase only 8 percent per year; (e) that payments totalling $819,-000 to broker dealers could be capitalized for tax purposes; and (f) that the Butano Building would be sold on December 31, 2002 for $52,000,000.

202. In fact, Stuart Becker Co. & Becker knew that each of these assumptions was false and contradicted by available information....

203. The October 15, 1984 review letter indicates that Stuart Becker & Co. and Becker had also reviewed the non-financial parts of the Sacramento Associates Private Placement Memorandum and represented that the Financial Projections were suitably supported by information contained in the Sacramento Associates Private Placement Memorandum.

204. The October 15, 1984 review letter also represented that the information contained in the non-financial sections of the Sacramento Associates Private Placement Memorandum was reasonable and not contradicted by known information. However, contrary to this representation, Stuart Becker & Co. and Becker knew, based on their pre-existing and long-term affiliation with the Rothschild Group, that material representations contained in the non-financial sections of the Sacramento Associates Private Placement Memorandum were false. Specifically, [they] knew (i) that the arm's-length price paid for the Butano Property to a third party seller was much less than ... and (ii) that the transactions involving

North American did not have an economically substantial basis.

205. Subsequent to the closing of the Sacramento Associates offering, defendants Stuart Becker & Co. and Becker performed an audit of the financial statements of Sacramento Associates in which [they] intentionally or recklessly failed to disclose that the assumptions underlying the financial projections had proven entirely invalid. This audit was conducted in a manner which contravened generally accepted accounting principals [sic].

321. The Financial Projections purported to be based on the Assumptions and the Notes which were set forth in the prospective financial information.

322. In their October 15, 1984 review letter, Stuart Becker & Co. represented and opined that: (i) they had prepared the Financial Projections; (ii) they had compared the Assumptions and Notes to the Sacramento Associates Private Placement Memorandum, the partnership agreement and other materials which had been supplied by MHT Properties, the general partner of Sacramento Associates; (iii) they had verified that the Financial Projections and the financial information contained in the Schedules which they had prepared had been accurately based on the Assumptions and Notes; and (iv) that the Financial Projections and the information contained in the Schedules they had prepared gave effect in all material respects to the Assumptions and the Notes.

323. The representations and opinions by Stuart Becker & Co. and Becker contained in the October 15, 1984 review letter were materially false and misleading because the Assumptions and Notes to the Financial Projections were false and unreasonable, did not support the Financial Projections and the information contained in the Schedules and were contradicted by information (i) which was known and available to Stuart Becker & Co. and Becker and (ii) which, at minimum, Stuart Becker & Co. and Becker would have ascertained had they complied with AICPA guidelines.

324. The review letters falsely indicated to plaintiffs and other investors that the Financial Projections and the information contained in the schedules could be relied upon without further inquiry.

325. Plaintiffs reasonably relied upon the false and misleading statements in the October 15, 1984 review letter prepared by Stuart Becker & Co. and Becker and this false and misleading letter was material to plaintiffs' decisions to invest in the Sacramento Associates Limited Partnership.

326. By preparing the October 15, 1984 review letter containing these materially false and misleading representations and opinions, Stuart Becker & Co. and Becker violated Section 10(b) of the 1934 Act and SEC Rule 10b–5.

327. By preparing the October 15, 1984 review letter and the Financial Projections, Stuart Becker & Co. and Becker assumed a duty to plaintiffs and other Sacramento Associates limited partners and the investing public to correct any inaccurate or misleading statements in the Financial Projections and Assumptions in any subsequent accountants' work product they prepared for distribution to the Sacramento Associates Limited Partnership.

328. Stuart Becker & Co. and Becker violated their duty to disclose any inaccurate or misleading statements in the financial projections and assumptions when they prepared an audit, which was dated March 5, 1985, which did not disclose that the Assumptions and Notes, which were the basis of the financial projections contained in the Sacramento Associates Private Placement Memorandum, had not been accurate or reasonable at the time the Sacramento Associates Private Placement Memorandum was initially disseminated and had also been further contradicted by subsequent events.

329. Defendants Stuart Becker & Co. and Becker also intentionally and willfully assisted, aided and abetted the securities frauds committed by the defendants who prepared the non-financial portions of the Sacramento Associates Private

Placement Memorandum by permitting these defendants to trade on and use the name of Stuart Becker & Co. in the private placement memorandum by providing the prospective financial information for inclusion in the private placement memorandum and by intentionally refusing to disclose these defendants' illegal activities.

330. Stuart Becker & Co. and Becker also knowingly aided, assisted and abetted the securities fraud perpetrated by the defendants responsible for the preparation of the non-financial portions of the private placement memorandum and by failing to disclose these other defendants' misappropriations of the limited partnership funds, self-dealing and wrongful concealment.

331. Stuart Becker & Co. and Becker also actively assisted in the fraudulent sale of the interests in the Sacramento Associates Limited Partnership by soliciting their clients, including Monty D. Kaufman, Robin M. Kaufman and Bernard Certilman, to purchase interests in the Sacramento Associates Limited Partnership. As a result of obtaining the investments of various plaintiffs, Stuart Becker & Co. and Becker received illegal bribes and sales commissions from the Rothschild Group.

In fact, these paragraphs reveal that the Alberti complaint fails to plead a misstatement by the Becker Defendants altogether. The substance of the allegations is that the October 15, 1984 review letter stated that MHT Corp. had supplied the Becker Defendants with the Notes and Assumptions upon which they prepared the Financial Projections and Schedules, *id.* ¶¶ 185, 189; that the review performed by the Becker Defendants included a comparison of the Assumptions and Notes with other information supplied by MHT Corp. and that that information verified the accuracy of the Notes and Assumptions, ¶¶ 190–91; and that the Assumptions and Notes provided a reasonable basis for the Financial Projections. Nevertheless, the Alberti complaint fails to plead any facts demonstrating that MHT Corp. did not supply the Becker Defendants with the information, that the re-

view by the Becker Defendants did not compare the Notes and Assumptions with other information supplied by MHT Corp. that verified the accuracy of the Notes and Assumptions, and that the Notes and Assumptions did not provide a reasonable basis for the Financial Projections.

Furthermore, the Alberti complaint does not allege that the Becker Defendants opined, or misrepresented, that the information supplied to them was accurate. Even if such an allegation was made, the Alberti complaint does not specify how the Becker Defendants were aware of any falsity. The Alberti complaint makes only conclusory allegations that the Becker Defendants "knew" of the falsities in the Notes and Assumptions upon which the financial projections were based, *see, e.g.,* ¶¶ 197–98, 201–02, or demands that an inference of scienter be drawn from the Becker Defendants' "long-term relationship" with the Rothschild Group based on the preparation of prospective financial information for "many previous Rothschild Group Offerings." *See e.g.,* ¶¶ 187, 204.

It is well-settled that an inference of fraud does not arise from the mere fact that an auditor reported on allegedly inaccurate data. *See O'Brien v. National Property Analysts Partners,* 719 F.Supp. 222, 228 (S.D.N.Y.1989); *The Limited,* 683 F.Supp. at 394. Furthermore, the allegation of a "long-term relationship" itself is unparticularized, with the exception of one prior engagement the Becker Defendants had with a Rothschild Group entity. *See Alberti Comp.* ¶ 187. Even assuming that the allegation of a "long-term relationship" were properly pleaded and true, however, the Alberti complaint fails to plead facts from which it can be inferred that the Becker Defendants knew of any infirmities in prior transactions. *See O'Brien,* 719 F.Supp. at 228 (fact that defendant may have participated in fifty allegedly fraudulent tax shelter does not permit inference of knowledge of fraud); *Dannenberg,* 603 F.Supp. at 1241 (participation in prior transactions, absent pleading of facts from which inference of knowledge that any of these transactions was fraudulent, insuffi-

cient under Rule 9(b)). Moreover, even if they had had such knowledge, it would not imply scienter of any fraud in the Sacramento Associates offering.

■ The Alberti plaintiffs assert that they have adequately pleaded scienter by the Becker Defendants in the paragraphs pertaining to the AICPA guidelines. Alberti Comp. ¶¶ 194–200. They allege that the Becker Defendants were required to follow the AICPA guidelines for this limited engagement, and in so doing, allegedly discovered the fraudulent information. Alternatively they allege the Becker Defendants should have followed AICPA guidelines but did not, and thereby fraudulently concealed the information.

In contrast to Generally Accepted Auditing Principles ("GAAP"), in compliance with which *audits* must be carried out, the Alberti plaintiffs have cited no authority for the proposition that compliance with the AICPA guidelines are mandatory in preparing financial projections and therefore "apply" as the Alberti complaint alleges. Even if they did apply, however, failure to comply with the AICPA guidelines amounts to "nothing more than negligence. This is not a proper basis for a claim under rule 10b–5." *Zupnick v. Thompson Parking Partners*, 1990 WL 113197 (S.D.N.Y. Aug. 1, 1990); *see also O'Brien*, 719 F.Supp. at 228 (where "[t]he gist of the Complaint ... is an alleged failure to investigate.... a purported failure to investigate '[does] not rise above the level of negligence, which is legally insufficient.'" *O'Brien*, 719 F.Supp. at 228 (citations omitted).

Moreover, the Alberti complaint does not allege that the Becker Defendants represented that they had complied with these guidelines, thus negating any assertion that that statement constituted a misrepresentation. Even if they had made that representation, those standards would not have required the Becker Defendants to verify the information upon which the review letter was based, *see Zupnick* ("A compilation report, unlike an examination, does not require an accountant to verify that the assumptions provided by manage-

ment are accurate."), and thus would not have been pleaded false by the Alberti complaint.

The allegations that the Becker Defendants committed primary and secondary securities fraud under 10(b) by soliciting prospective investors, namely Monty Kaufman, Robin Kaufman and Bernard Certilman, also fail to satisfy the pleading requirements of Rule 9(b). Paragraphs 237 and 331, pertaining to these alleged solicitations, omit the most basic information required under Rule 9(b) by failing to specify when and where the alleged representations were made, their content, and how the investors relied on them in making their investments. *See Luce*, 802 F.2d at 54–55. Moreover, the Alberti plaintiffs' bare allegation that the Becker Defendants failed to disclose that they received bribes and commissions for soliciting investors is wholly unsupported by any factual allegation that they indeed did receive such remuneration.

For the foregoing reasons, this court finds that the Alberti complaint does not properly plead a primary 10(b) violation by the Becker Defendants.

■ The Becker Defendants are also charged with aiding and abetting the fraudulent conduct of the other defendants. To establish aiding and abetting liability under the securities laws, a plaintiff must demonstrate (1) a securities violation by a primary wrongdoer, (2) knowledge of the wrongdoing, and (3) substantial assistance in the primary wrongdoing. *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir.1983). Even assuming that the Alberti complaint pleads the first element, it fails to particularize facts implying knowledge by the Becker Defendants of any false and misleading statements in the Sacramento PPM. Any allegations of scienter that are detectible stop short at the mere conclusion that the Becker Defendants simply "knew" or knew by virtue of the "long-standing relationship" between the parties that "(i) that the arm's-length price paid for the Butano Property to a third party seller was much less than ... and (ii) that the transactions involving North American did not

have an economically substantial basis." *See e.g.,* Alberti Comp. ¶¶ 204, 329–30. While these paragraphs may specify *what* the Becker Defendants allegedly "knew," they do not specify any facts indicating *how* they knew it. As independent contractors that have not even been alleged to be "insiders," the Becker Defendants cannot be held for the general statements in the Sacramento Associates PPM. *See Stevens v. Equidyne Extractive Indus. 1980,* 694 F.Supp. 1057, 1063 (S.D.N.Y.1988). Furthermore, as discussed above, the allegation of a long-term relationship does not constitute a satisfactory pleading of scienter. For these reasons, the aiding and abetting claim is not properly pleaded under Rule 9(b).

#### Mail Fraud and Fraudulent Concealment

For the reasons articulated with respect to Abrams and the Mintz Fraade Defendants, the court finds that the charges of mail fraud and fraudulent concealment by the Becker Defendants has not been adequately pleaded.

Because the Alberti complaint thus fails to plead at least two predicate acts with the requisite particularity, the RICO claims against the Becker Defendants are dismissed.

#### State Law Claims

The reasons supporting dismissal of the state law claims against Abrams and the Mintz Fraade Defendants apply equally to those against the Becker Defendants.

### II. THE MORIN ACTIONS

#### A. *Facts*

The plaintiffs in the *Morin* actions (the "Morin plaintiffs") are sixty three individual investors in nine unsuccessful Florida limited partnerships formed to own and operate commercial real estate (the "118–119, 130 Series, and 218 Limited Partnerships" or the "Investor Partnerships") and in four trusts formed to purchase and own helicopters (the "Airjet Trusts"). The Investor Partnerships were organized to acquire interests in four other limited partnerships (the "Owning Partnerships")

which had been organized to own and operate commercial real estate located in Sarasota Florida; Grand Rapids, Michigan; Dallas, Texas; and Indianapolis, Indiana. The second amended consolidated complaint (the "Morin complaint") alleges that Trupin, Rothschild Reserve and numerous other defendants, including the Moving Defendants, fraudulently induced the Morin plaintiffs to invest in the Investor partnerships and the Airjet Trusts through allegedly unlawful securities offerings promoted by allegedly fraudulent private placement memoranda (the "118–119, 130 Series and 218 PPM's") and other offering materials (collectively, the "Morin Offering Materials"). The Morin action is a consolidation of various related litigations involving the Investor Partnerships and Airjet Trusts.

Despite differences in the subject matter of the limited partnerships and trusts involved in the Morin action, the schemes, various misdeeds, acts allegedly attributable to each of the Moving Defendants and the substance of the 118–119, 130 Series and 218 PPM's are substantially similar to those involved in the Alberti action. Any differences that do exist are immaterial to the Rule 9(b) inquiry, and the Morin complaint suffers from the same infirmities as the Alberti complaint. Therefore, the 10(b) and RICO claims against Abrams and Becker in the Morin action are dismissed for failure to plead fraud with particularity and to plead at least two predicate acts. The pendent claims are dismissed for lack of pendent jurisdiction. Because of the defects in the pleading of the mail fraud and fraudulent concealment claims, the RICO claims against the Mintz Fraade Defendants are dismissed for failure to plead two predicate acts forming a pattern of racketeering activity. Nevertheless, because *Lampf* may not bar the 10(b) claims of certain Morin plaintiffs against the Mintz Fraade Defendants, which, as concluded above are pleaded with sufficient particularity to satisfy Rule 9(b), the 10(b) claims against the Mintz Fraade Defendants held by those plaintiffs falling outside of *Lampf*'s scope survive the motion to dismiss.

## B. *Procedural History*

The procedural history of the *Morin* action prior to the filing of the second amended consolidated complaint is summarized in a prior opinion of the court, familiarity with which is assumed. *See Morin v. Trupin,* 747 F.Supp. 1051 (S.D.N.Y.1990). Briefly, the complaint in *Morin v. Trupin,* 88 Civ. 5743, was filed on August 17, 1988. On November 29, 1988, a separate action was filed in *Blaikie v. Trupin,* 88 Civ. 8464. On May 23, 1989, a third group of plaintiffs filed the action of *Petersen v. Trupin,* 89 Civ. 3102, and on October 18, 1989, a fourth group filed the action of *Seal v. Trupin,* 89 Civ. 5746. In April of 1988, the *Morin* and *Blaikie* actions were consolidated, following which the plaintiffs filed a consolidated and amended complaint in February of 1989. All four of the actions were consolidated under index number 88 Civ. 5743 in December of 1989.

Following this court's dismissal of the consolidated amended complaint in *Morin v. Trupin,* 747 F.Supp. 1051 (S.D.N.Y.1990), the *Morin* plaintiffs filed the second amended complaint (the "Morin complaint"), which is the subject of the present motions, on December 22, 1990. On April 4, 1991, a motion to amend to add additional investors (the "Additional Investors") as plaintiffs was granted.

## C. *Discussion*

### 1. Lampf Bars Only Some of the 10(b) Claims

▬ The Morin complaint specifies that each of the Morin plaintiffs purchased their interests in the Investor Partnerships and Airjet Trusts in either October 1985, December 1985, February 1986, September 1986 or November 1988. Thus, unlike the Alberti plaintiffs, some plaintiffs in the Morin action undeniably commenced their actions within the three year statute of limitations established in *Lampf*. Nevertheless, two problems remain in disposing of the *Lampf* question. First, the Morin complaint does not specify when each of the Morin plaintiffs discovered the alleged fraud, making it impossible to determine whether *Lampf* bars any claims for failure to commence the action within one year of discovery. *See* Morin Comp. ¶ 9 ("Plaintiffs have recently ascertained that these Offering Materials contained numerous material misrepresentations...."); *Lampf,* 111 S.Ct. at 2782 ("Litigation instituted pursuant to § 10(b) and Rule 10b–5 ... must be commenced within one year after the discovery of the facts constituting the violation *and* within three years after such violation." (emphasis added)). The Morin plaintiffs are thus instructed to make further submissions addressing this question.

▬ The second remaining problem arises from the consolidation of four actions, some of which were commenced within the absolute three-year limit for bringing 10(b) claims and others of which were not. Therefore, unless this court finds, as the Morin plaintiffs urge, that the *Blaikie, Petersen* and *Seal* complaints "relate back" to the time of the original *Morin* complaint, the 10(b) claims of many of the plaintiffs who were originally part of those actions will be barred under the three-year limitation of *Lampf* alone.

The Morin plaintiffs argue that, under Federal Rule of Civil Procedure 15(c) ("Rule 15(c)"), the complaints in all of the consolidated actions relate back to August 17, 1988, the date on which the original Morin complaint was filed.

Technically, this argument is inapposite since, with the exception of the Adkins Group and the Additional Investor, this case involves a *consolidation* rather than an amendment of original pleadings to add new plaintiffs. The purpose of Rule 15 "is to provide maximum opportunity for each claim to be decided on its merits rather than on procedural technicalities." 6 C. Wright & A. Miller & Kane, Federal Practice and Procedure § 1471, at 359 (1971). The consolidation rule, Fed.R.Civ.P. 42, on the other hand, has as its end "to give the court broad discretion to decide how cases on its docket are to be tried so that the business of the court may be dispatched with expedition and economy while providing justice to the parties." *Id.* § 2382, at 253. Thus, while Rule 15 may be said to

have "substantive" objectives, consolidation is a trial management device for which the policies of Rule 15 have no relevance.

Moreover, allowing relation back of claims of plaintiffs in consolidated, untimely actions totally defies the reasoning and import of *Lampf.* The *Lampf* Court provided that claims under § 10(b) and Rule 10b–5 must be brought no later than three years after the accrual of the cause of action and specifically rejected the equitable tolling doctrine as "fundamentally inconsistent with the 1–and–3–year structure." *Lampf*, 111 S.Ct. at 2782. This decisive limitation would be rendered meaningless if a plaintiff who discovers fraud after the three-year period has elapsed may effectively benefit from the equitable tolling doctrine by piggybacking his action which, if tried separately, would be clearly barred, on a timely one through consolidation.

Even if Rule 15 were applicable, however, the *Blaikie, Petersen* and *Seal* complaints do not relate back to August 17, 1988. Rule 15(c) provides:

> Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading. An amendment *changing* the party against whom a claim is asserted relates back if the foregoing provision is satisfied and, within the period provided by law for commencing the action against the party to be brought in by amendment that party (1) has received such *notice* of the institution of the action that the party will not be prejudiced in maintaining his defense on the merits, *and* (2) knew or should have known that, but for the *mistake* concerning the identity of the proper party, the action would have been brought against the party.

Fed.R.Civ.P. 15(c) (emphasis added).

Although the language of Rule 15(c) does not explicitly govern the relation back of amendments changing or adding plaintiffs, the Advisory Committee Notes to the 1966 amendment to the rule state that "the attitude taken in revised Rule 15(c) toward change of defendants extends by analogy to amendments changing plaintiffs." *See Nielsen v. Professional Financial Management, Ltd.*, 682 F.Supp. 429, 435 (D.Minn.1987).

The plain language of Rule 15(c) instructs a court determining whether the claim of an added plaintiff relates back to undertake a two-pronged inquiry focused on (a) notice to defendant of the existence of the additional claim within the limitations period, *see* Fed.R.Civ.P. 15(c)(1), and (b) mistake in the original pleading as to the proper party, *see* Fed.R.Civ.P. 15(c)(2). *See Schiavone v. Fortune*, 477 U.S. 21, 26, 106 S.Ct. 2379, 2383, 91 L.Ed.2d 18 (1986) (petitioners argued that "where intended defendant was misdesignated in form only, and knew or reasonably should have known that it was the true target and received the same notice ... 'relation back should be a foregone conclusion.' "); *id.* at 31, 106 S.Ct. at 2385 ("The linchpin is notice, and notice within the limitations period").

Notice requires more than that the added claim "arises out of the same transaction or occurrence." *See, e.g., Leachman v. Beech Aircraft Corp.*, 694 F.2d 1301 (D.C.Cir.1983). In *Leachman*, for instance, the court wrote that:

> We find persuasive the emphasis by the court in *Williams* [*v. United States*, 405 F.2d 234 (5th Cir.1986)] on the need to limit relation back of claims asserted by new plaintiffs in some way beyond the "conduct, transaction, or occurrence" test that applies to relation back of amendments generally. Without some limit, total strangers with claims arising out of a multi-victim incident might join pending actions long after the statute of limitations has elapsed. That would allow tardy plaintiffs to benefit from the diligence of the other victims, and, more importantly, could cause defendants' liability to increase geometrically and their defensive strategy to become far more complex long after the statute of limitations has run.... defendants would ... be deprived of their interests in repose.

At some point, defendants should have notice of who their adversaries are.

*Id.* at 1309.

In *Nielsen v. Professional Financial Management, Ltd.*, 682 F.Supp. 429 (D.Minn.1987), the court found that defendants had sufficient notice of the possibility of additional claims prior to the running of the statute of limitations where (1) the original and added plaintiffs were all investors in various tax shelters and thus shared an "identity of interest," *id.* at 435; (2) the timely complaint had stated that "[p]laintiffs are one [sic] of several hundred Energy Brain investors nationwide and one [sic] of several investors in this district" and, (3) defendants had sent a letter to their insurance company advising of potential claims by investors including the new plaintiffs.

The original complaint in the Morin action does not satisfy the notice prong as per *Nielsen* since it contained no like intimation of a greater universe of possible plaintiffs. Nevertheless, at least one court has found that where the original plaintiffs were limited partners alleging securities fraud by the defendants, the *status* of the original plaintiffs implied notice as to the existence of possible claims by other limited partners. *See Stoppelman v. Owens*, 580 F.Supp. 944 (D.D.C.1983). In *Stoppelman*, the court found that "the amended complaint ... did no more than add additional Plaintiffs to this action. The additional Plaintiffs, like the original Plaintiffs Stoppelman and Cohen, are limited partners in Oil Well Equipment 1980. Their claims arise out of the same conduct, transaction, or occurrence alleged in the original complaint." *Id.* at 946. The court found that "[t]he purpose behind the statute of limitations, namely notice, is not defeated in this action by permitting the amended complaint to relate back...." *Id.* at 947.

*Stoppelman* seems to indicate that the *notice* prong of the Rule 15(c) inquiry is satisfied where new plaintiffs share a status with the original plaintiffs such that the defendant's defense strategy will not be prejudiced by the addition of more plaintiffs, even though it will be exposed to the potential for additional damages. Nevertheless, the *Stoppelman* analysis disregards Rule 15(c)(2). Subsection (2) makes clear that Rule 15(c) does not exist merely to keep the door open for any tardy plaintiff of whom a defendant may be aware. Rather, Rule 15(c) stands as a remedial device for adding or substituting a party who "but for a *mistake* concerning the identity of the proper party" would have been named originally. *See* Fed. R.Civ.P. 15(c)(2).

Additional language in the Advisory Committee's Notes to Rule 15 suggesting that Rule 15(c) be read *in pari materia* with Fed.R.Civ.P. 17(a) supports the conclusion that subsection (2) of Rule 15(c) is central in determining relation back. The Advisory Committee's Notes state that:

[a]lso relevant is the amendment of Rule 17(a) (real party in interest). To avoid forfeitures of just claims, revised Rule 17(a) would provide that no action shall be dismissed on the ground that it is not prosecuted in the name of the real party in interest until a reasonable time has been allowed for correction of the defect in the manner there stated.

There has been no suggestion that the Morin plaintiffs who were originally part of the *Blaikie, Petersen* and *Seal* actions were omitted as the proper plaintiffs in the original Morin complaint by mistake. Therefore, even assuming that the status of the plaintiffs named in the original Morin complaint put the defendants on notice of claims of other limited partners, the criteria of Rule 15(c) for relation back have not been met. For that reason, the § 10(b) claims of the following plaintiffs are time barred under *Lampf:*

| Name | Purchase Date | Complaint Date |
| --- | --- | --- |
| Earl J. Field | October 1985 | Nov. 29, 1988 |
| Lon & Sandis Graves | October 1985 | Nov. 29, 1988 |
| James Marshall | October 1985 | Nov. 29, 1988 |

| Name | Purchase Date | Complaint Date |
|---|---|---|
| Frank Schuler III | October 1985 | Nov. 29, 1988 [2] |
| Arnold Peterson | February 1986 | May 23, 1989 |
| | December 1985 | |
| Richard Ratner | February 1986 | May 23, 1989 |
| | December 1985 | |
| Robert & Mary Nejdl | February 1986 | Oct. 18, 1989 |
| Joyce Seal | February 1986 | Oct. 18, 1989 |
| James E. Wheeler | February 1986 | Oct. 18, 1989 |
| Anant R. Mauskar | September 1986 | Dec. 22, 1990 |
| Coremco | 1988 | March 29, 1991 |
| William J. Adkins | October 1985 | April 4, 1991 |
| James E. Campbell | December 1985 | April 4, 1991 |
| Eugene Cole | September 1986 | April 4, 1991 |
| Robert Duca | December 1985 | April 4, 1991 |
| Gerald Hamburg | February 1986 | April 4, 1991 |
| Michael Hay | February 1986 | May 23, 1989 |
| Steven Levine | September 1986 | April 4, 1991 |
| Jim Meyer | February 1986 | April 4, 1991 |
| Paul Miller | December 1985 | April 4, 1991 |
| Michael O'Dohoghue | December 1985 | April 4, 1991 |
| Kenneth Rivera | October 1985 | April 4, 1991 |
| Neil Sendar | December 1985 | |
| | February 1985 | April 4, 1991 |
| Antonio Simoes | February 1986 | April 4, 1991 |
| Reed Tupper | September 1986 | April 4, 1991 |
| Harland Svare | February 1986 | April 4, 1991 |
| Eray Oge | February 1986 | April 4, 1991 |
| Peter Hall | December 1985 | April 4, 1991 |
| Michael E. Hickey | June 1986 | April 4, 1991 |

Absent a federal claim, the pendent claims of the Morin plaintiffs listed above are dismissed for lack of pendent jurisdiction.

### 2. State Law Claims Against the Mintz Fraade Defendants

The following discussion addresses the viability of the state law claims of the remaining Morin plaintiffs.

#### Negligent Misrepresentation, Breach of Fiduciary Duty and Legal Malpractice Claims

 The Morin plaintiffs charge the Mintz Fraade Defendants with negligent misrepresentation, breach of fiduciary duty and legal malpractice. These claims must be dismissed because, as attorneys to the general partners, the there was no privity between the Mintz Fraade Defendants and the limited partners and the Mintz Fraade Defendants owed no fiduciary duty to the limited partners. *See Quintel*, 589 F.Supp. 1235, in which this court wrote:

> To hold that a limited partner is automatically a foreseeable client of the attorney representing the general partners or even the limited partnership, in the absence of any affirmative assumption of duty by the attorney, would ignore Ethical Consideration 5–18 which specifically defines the attorney's allegiance to the entity that retained him rather than to any person connected with the entity. No facts have been alleged here to suggest that it was reasonably foreseeable that Quintel, who was represented by separate counsel, would rely on Conboy to act as its lawyer.

*Id.* at 1241–42. Furthermore, with respect to negligent misrepresentation, the court wrote:

---

2. Schuler's 10(b) claim based on his December 1985 purchase survives the *Lampf* dismissal.

The New York Court of Appeals has stated the basic elements of a cause of action for negligent misrepresentation as follows:

> As to duty imposed, generally a negligent statement may be the basis for recovery of damages, where there is carelessness in imparting words upon which others were expected to rely and upon which they did act or failed to act to their damage ..., but such information is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise, to act with care if he acts at all....

*Id.* at 1243–44 (quoting *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977)).

### Blue Sky Law Claims

The Morin complaint also sets forth causes of action for alleged violations of the Blue Sky Laws of numerous states wherein the Morin plaintiffs reside. The Moving Defendants have moved to dismiss the Blue Sky Law claims as time barred.

Based on the limitations periods cited by both sides, the Blue Sky Law claims of the following remaining Morin plaintiffs are dismissed as time barred:

| Name | State | Limitation Period |
| --- | --- | --- |
| Simeon Morin | Connecticut | Two years from contract of sale. Purchased interest in December 1985. Brought action August 17, 1988. |
| JFA Associates | Connecticut | See above. Purchased interest in February 1986. Brought action on November 29, 1988. |
| Louis Linker | North Carolina | Two years from sale. N.C.Gen.Stat. § 78A–56(f). Purchased interest in February 1986. Brought action on November 29, 1988. |

### III. ALL DISMISSALS IN THE ALBERTI AND MORIN ACTIONS ARE WITH PREJUDICE

Because the Alberti and Morin plaintiffs have had ample opportunity to properly plead their cases, leave to replead yet again is denied. *See Goldman v. McMahon,* 706 F.Supp. 256, 263 (S.D.N.Y.1989).

### IV. THE CLAIMS AGAINST THE MINTZ FRAADE DEFENDANTS IN THE GAAR COMPLAINT ARE DISMISSED WITHOUT PREJUDICE

The Mintz Fraade Defendants have moved to dismiss the complaint in the related action of *Gaar v. Trupin,* 89 Civ. 6639 (RWS). The claims against the Mintz Fraade Defendants in that complaint are dismissed for lack of opposition to that motion, with leave to replead in conformity with the requirements discussed in this opinion and in *Morin v. Trupin,* 747 F.Supp. 1051 (S.D.N.Y.1990).

### Conclusion

For the foregoing reasons, the motions to dismiss with the complaint in *Alberti v. Trupin* as against Abrams, the Mintz Fraade Defendants and the Becker Defendants are granted in all respects. The motions to dismiss the complaint in *Morin v. Trupin* as against Abrams and the Becker Defendants are granted in all respects. The motion to dismiss the RICO claims,

and claims for negligent misrepresentation, breach of fiduciary duty, legal malpractice claims against the Mintz Fraade Defendants is granted. The motion to dismiss the § 10(b) and Rule 10b–5 claims against the Mintz Fraade Defendants is granted as to only those of the Morin plaintiffs barred under *Lampf.* The motion to dismiss the Blue Sky Law claims of the remaining Morin plaintiffs is granted only as to the claims of those plaintiffs named above. All dismissals in the Alberti and Morin actions are with prejudice. Abrams's motion for Rule 11 sanctions is denied.

It is so ordered.