Simeon MORIN, et al., Plaintiffs,

v.

Barry H. TRUPIN, et al., Defendants,

Norman E. GAAR, Plaintiff,

v.

Barry H. TRUPIN, et al., Defendants,

Michael P. ALBERTI, M.D.,
et al., Plaintiffs,

v.

Barry E. TRUPIN, et al., Defendants.

Nos. 88 Civ 5743(RWS), 89 Civ. 6639(RWS), 90 Civ. 3475(RWS).

United States District Court,
S.D. New York.

Jan. 6, 1993.

As Amended Jan. 20, 1993.

---

Fink Weinberger, P.C., New York City, for plaintiffs; by Stephen E. Power, Elisabeth Seieroe Maurer.

D'Amato & Lynch, New York City, for defendants Mintz, Fraade & Zeiger, Frederick M. Mintz and Alan Fraade; by Stephen F. Willig.

McDonough Marcus Cohn & Tretter, P.C., New York City, for defendant Stuart Becker & Co.; by Diane K. Kanca, Eugene H. Goldberg.

Eaton & Van Winkle, New York City, for defendants Continental Realty Corp. and Emanuel Organek; by Michele C. Petitt.

## OPINION

SWEET, District Judge.

Plaintiffs in the *Alberti* action (the "*Alberti* Plaintiffs") have moved for the court to reconsider its order of November 18, 1991 (*Morin v. Trupin*, 778 F.Supp. 711 (S.D.N.Y.1991)), dismissing Robert Abrams, Stuart Becker and Stuart Becker & Co., P.C. (the "Becker Defendants" or "Becker"), and Mintz, Fraade, and Zeiger, P.C., Frederick M. Mintz and Alan Fraade (the "Mintz Fraade Defendants") with prejudice, and for leave to amend their Second Amended Complaint by filing their proposed Third Amended Complaint. Plaintiffs in the consolidated *Morin* action (the "*Morin* Plaintiffs") also have moved for leave to amend their Second Amended Consolidated Complaint, filed December 21, 1990, dismissing Robert Abrams, Stuart Becker and Stuart Becker, P.C., with prejudice, and dismissing the Mintz Fraade defendants without prejudice. The *Morin* Plaintiffs have also moved for leave to file their proposed Third Amended Consolidated Complaint, pursuant to Federal Rules of Civil Procedure, Rules 15(a) and 60(b). The motion to reconsider is granted, as is the motion to amend as set forth below.

The underlying disputes and principal parties which are the subject of these actions are recounted in prior opinions of the court, familiarity with which is assumed. *See, e.g., Morin v. Trupin*, 711 F.Supp. 97 (S.D.N.Y.1989) (filed April 13, 1989); *Morin v. Trupin*, 728 F.Supp. 952 (S.D.N.Y. 1989) (filed December 13, 1989); *Morin v. Trupin*, 738 F.Supp. 98 (S.D.N.Y.1990) (filed May 4, 1990); *Morin v. Trupin*, 747 F.Supp. 1051 (S.D.N.Y.1990) (filed September 29, 1990); *Morin v. Trupin*, 778 F.Supp. 711 (S.D.N.Y.1991) (filed November 18, 1991); and *Morin v. Trupin*, 799 F.Supp. 342 (filed July 28, 1992).

## I. THE ALBERTI ACTION

### *Prior Proceedings*

The *Alberti* Plaintiffs filed their original complaint in May, 1990. Additional Plaintiffs were added by Amended Complaint on June 28, 1990. The Becker defendants moved to dismiss the *Alberti* Amended Complaint pursuant to Federal Rules of Civil Procedure, Rules 9(b) and 12(b)(6), which motion was considered together with the complaint in *Morin* on September 29, 1990 (*Morin v. Trupin*, 747 F.Supp. 1051 (S.D.N.Y.1990)), and granted with leave to replead. The *Alberti* Plaintiffs' motion to strike Continental and Organek from the caption of their complaint and to amend their complaint was granted by order dated February 1, 1991.

This Second Amended Complaint was filed on February 22, 1991. It was considered together with the motion of the *Morin* Plaintiffs and was dismissed with prejudice against all defendants except the law firm Mintz, Fraade on November 18, 1991 (*Morin v. Trupin*, 778 F.Supp. 711 (S.D.N.Y. 1991)), for deficiencies in pleading and for being time-barred under *Lampf.* Certain

plaintiffs were reinstated pursuant to Section 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991 (codified at § 27A of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa–1) in an opinion of this court filed on July 28, 1992 (*Morin v. Trupin*, 799 F.Supp. 342 (S.D.N.Y.1992)). The *Alberti* Plaintiffs now move for the Court to reconsider the dismissal with prejudice dated November 18, 1991 for deficiencies in pleading and for leave to reinstate their claims and to file a Third Amended Complaint for the same reasons given in the motion of the *Morin* Plaintiffs, considered here as well.

Oral argument was heard on July 1, 1992. Plaintiffs submitted reply papers after oral argument, on July 2, and defendants filed additional papers on July 10, July 13, and July 20, 1992. The motion was considered fully submitted at that time.

*Facts*

The *Alberti* Plaintiffs are fifty-three investors in a New York limited partnership known as the Sacramento Office Park Associates ("Sacramento Associates"), organized for the stated purpose of acquiring, owning, operating and leasing a two-building office park complex known as the Butano Buildings in Sacramento, California (the "Butano Property" or the "Sacramento Property").

Plaintiffs allege that in making their investments in Sacramento Associates, they relied upon false and misleading representations contained in the Sacramento Office Park Associates Series Private Placement Memorandum (the "Sacramento PPM"), solicitation letters, and sales and promotional literature (collectively the "Sacramento Offering Materials") and on oral representations by various defendants. The Sacramento Offering Materials allegedly contained misrepresentations regarding the manner in which the Butano Property was acquired for syndication, the value and commercial viability of the Butano Property, the application of the proceeds of the offering of limited partnership interests in Sacramento Associates, and the basis for and availability of the tax benefits de-

scribed in the Sacramento PPM. All of the Plaintiffs in the *Alberti* action are alleged to have purchased their limited partnership interests in Sacramento Associates by February of 1985. They allege they only discovered the fraud despite their reasonable diligence when creditors of Sacramento Associates foreclosed on the Butano Property.

The *Alberti* Plaintiffs' Third Amended Complaint (hereinafter "Complaint") alleges that Barry Trupin ("Trupin"), the Rothschild Group ("Rothschild Group"), and numerous other defendants fraudulently induced the Plaintiffs to invest in the limited partnerships through allegedly unlawful securities offerings. The Rothschild Group consisted of a multitude of interconnected companies which bought and structured the syndication of interests in real estate and offered it to investors through private placement memoranda. The Plaintiffs allege, *inter alia*, that the value of these real estate interests was falsely inflated by transferring the properties to an ostensibly unaffiliated tax-exempt company at an inflated price and then transferring them back into the holdings of the Rothschild Group such that the properties would carry too much debt to earn a profit, as the inevitable result of the fraudulently inflated acquisition price and the mortgages designed to pay for it. Moreover, the Plaintiffs allege, the defendants knew that the promised tax deductions (based on interest payments for secondary mortgages incurred in the transfers of the Properties) would be disallowed by the I.R.S. because these mortgages were not incurred in a transfer from an unaffiliated entity and therefore would not be considered a legitimate partnership debt. Plaintiffs further allege that the I.R.S. was "wise" to Trupin and his schemes since it had already audited and disallowed several tax shelters previously offered by Trupin and Trupin-controlled companies.

The *Alberti* Plaintiffs allege the Third Amended Complaint now particularizes the allegations dismissed earlier. The details are culled from affidavits (generally, the "Affidavits") by five individuals in Trupin's organization or related entities, all of

whom have recently signed releases with the Plaintiffs. The five Affidavits have been given by Gerald Schaffer ("Schaffer"), Frederick Gnesin ("Gnesin"), Sid Lieberman ("Lieberman"), Norman Leben ("Leben"), and Robert P. Ehrlich ("Ehrlich"). The issue in this case is whether the new pleadings in *Morin* and *Alberti*, based on these affidavits, should be permitted to be filed on the grounds that the Plaintiffs have presented the Court with newly-discovered evidence under Federal Rule of Civil Procedure, Rule 60, and have finally plead fraud with sufficient particularity to meet the requirements of Rule 9(b).

*Discussion*

### Standard for the Action

Rule 15(a) states that while leave to amend a complaint after twenty days requires permission of the court, "leave shall be freely given when justice so requires." Since the prior Amended Complaint in the *Alberti* action was dismissed with prejudice (778 F.Supp. at 737), Mintz, Fraade and Becker state that leave should be denied here and ask for sanctions. They argue that leave to amend should be denied, chiefly on the grounds that to the extent that Plaintiffs' affidavits add new evidence, the Plaintiffs' delay in waiting until now to question the witnesses amounts to prejudicial delay.

Plaintiffs respond by alleging that they need do not rely on either the newness or the sufficiency of the evidence to justify repleading under Rule 60(b). Instead, they argue, since this Court's November 1991 decision was a partial, nonfinal judgment under Rule 54(b), it "is subject to revision at any time before the entry of judgment adjudicating all the claims and rights and liabilities of all the parties," *id.*, and leave to replead under Rule 54 is governed solely by the Court's discretion.

■ The two rules are not as far apart as Plaintiff's Memorandum in Further Support make them seem. All dismissals in the *Alberti* action were with prejudice, but even if the dismissals are considered nonfinal, the standards under Rule 60(b) still apply:

Where a party seeks to avoid the [law of the case] by reopening factual issues based upon new evidence, it is appropriate for the court to apply the standards of Rule 60(b)(2), notwithstanding that rule's inapplicability to interlocutory judgments.... The Court must be satisfied that the evidence 1. is in fact newly discovered; 2. could not with due diligence have been discovered earlier; 3. is not merely cumulative or impeaching; 4. is material to the issues; 5. is such that upon retrial it would probably produce a different result.

*Johns–Manvillè Corp. v. Guardian Industries Corp.*, 116 F.R.D. 97 (E.D.Mich.1987). Regardless, therefore, of whether adjudication of the *Alberti* Plaintiffs' claims was final or not, the information in the Affidavits should rise to the level of "newly discovered evidence" within the meaning of Rule 60(b) before this Court will grant leave to replead a third time.

The affidavits were executed after the defendants were ordered to answer or to otherwise plead in regard to the Second Amended Complaint in *Morin*. Notices to take depositions were sent (and followed by a request for default judgment) and certain defendants sought to settle.

■ This delay was not due to neglect or bad faith and is appropriately based on newly discovered evidence. Leave to replead should be denied only if granting it appears futile. "[I]f the plaintiff has at least colorable grounds for relief, justice does so require unless the plaintiff is guilty of undue delay or bad faith or unless permission to amend would unduly prejudice the other party," *S.S. Silberblatt, Inc. v. East Harlem Pilot Block*, 608 F.2d 28, 42 (2d Cir.1979). Delay alone is not prejudicial to the defendants, provided they have suffered no lack of notice from it. Since all the defendants were named in the First Amended Complaint, all have been on notice of the nature of the claims against them since then. There is no allegation that the delay has foreclosed them from any action or remedy they might have. *Cf. Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 331, 91 S.Ct. 795, 802, 28

L.Ed.2d 77 (1971). "If the underlying facts or circumstances relied upon by a plaintiff may be a proper subject of relief, he ought to be afforded an opportunity to test his claim on the merits. In the absence of any apparent or declared reasons ... the leave sought should, as the rules require, be 'freely given.'" *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

### Plaintiffs Have Adequately Alleged All Defendants Are Insiders

■ Since the Third Amended Complaint alleges fraud (violations of § 10(b) of the '34 Act and mail fraud), it must meet the particularity requirements of FRCP Rule 9(b). Rule 9(b) provides: "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity. Malice, intent, knowledge and other condition of mind of a person may be averred generally." The rule is designed to assure defendants of "fair notice of the what the plaintiff's claim is and the grounds upon which it rests," *Denny v. Barber*, 576 F.2d 465, 469 (2d Cir.1978), to enable them to protect their reputation from unjustified strike suits, and to organize their defense against justified causes of action. Plaintiffs, therefore, have an obligation to set forth precisely what statements or omissions were made in what documents or oral representations, the time and place of each such statement and the person responsible for making it, the content of such statements and the manner in which they were misleading, and what the defendants "obtained" as a result of the fraud. *Beck v. Manufacturers Hanover Trust Co.*, 645 F.Supp. 675, 682 (S.D.N.Y.1986), *aff'd*, 820 F.2d 46 (2d Cir. 1987), *cert. denied*, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988).

■ References to the Offering Materials will satisfy Rule 9(b)'s requirements as to identification of the time, place, and content of the alleged misrepresentations. *Luce v. Edelstein*, 802 F.2d 49, 55 (2d Cir. 1986). If the defendants are insiders or affiliates participating in the offer of securities, the particularity requirements are somewhat relaxed. *Stevens v. Equidyne Extractive Ind. 1980*, 694 F.Supp. 1057, 1062 (S.D.N.Y.1988). Although partners and principals in partnerships are insiders (*Luce, supra*, at 49), and affiliates, controlling stockholders, officers and directors of partnerships are insiders, "it is less clear whether attorneys or accountants may be held under this relaxed standard of pleading." *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247–49 (2d Cir.1987). Outside attorneys and accountants will not be considered controlling persons unless they have influence over the day-to-day operations of the offering entity. *See Morin*, 778 F.Supp. at 718, and cases cited therein.

Here, in contrast to earlier pleadings, the Plaintiffs allege that the professional defendants are insiders, who knowingly and consciously participated in the scheme to defraud. The Plaintiffs must therefore allege some form of immediate control over operations, or else plead sufficient connections between these defendants and the certain allegedly misleading statements which can be ascribed specifically to them to meet the particularity requirements of Rule 9(b). *See Morin*, 778 F.Supp. at 718. They have succeeded here only in pleading the latter.

### The Becker Defendants

The Alberti Complaint once more states that the Becker Defendants committed primary violations of § 10(b) and Rule 10b–5 by (1) making false and misleading statements in the Sacramento PPM regarding prospective financial information and (2) soliciting prospective investors by preparing a letter reviewing the prospective financial information contained in the Sacramento Associates Private Placement Memorandum in which they failed to disclose that Barry Trupin was responsible for the Sacramento Associates Offering and that Stuart Becker & Co. had received illegal bribes and sales commissions from the Rothschild Group for each investor they successfully solicited to participate. The Alberti Complaint also alleges that the Becker Defendants aided and abetted the primary 10(b) violations of the other defen-

dants through their solicitation of prospective investors.

■■■ The relevant paragraphs of the Third Amended Complaint have now added:

189. Gnesin has testified that Becker made changes in the Assumptions used in compiling the Financial Projections in order to make the Sacramento Associates Offering more marketable to his clients. Therefore, Stuart Becker & Co. and Becker knew that the Financial Projections and the Assumptions did not accurately reflect the judgment and knowledge of MHT Properties but instead (i) that the Financial Projections were false and not based on the Assumptions or Notes and (ii) that the Assumptions and Notes were likewise false.

196. Gnesin has testified ... [that] Becker knew that the representation that North American was unaffiliated with the Rothschild Group was false because material assumptions used in the financial projection could be changed without the consent or approval of Stuart Stern [president of North American] or North American.

Without alleging precisely how Becker knew these assumptions were false, however, this states only a claim of negligence. The Plaintiffs merely allege that Gnesin discussed the assumptions with Stuart Becker "at length." No dates, times, or specific details which would indicate fraud instead of negligence are given. The Alberti Complaint still fails to plead any facts demonstrating that MHT Corp. did not supply the Becker Defendants with the information or that the review by the Becker Defendants did not compare the Notes and Assumptions with other information supplied by MHT Corp. that verified the accuracy of the Notes and Assumptions.

188. The October 15, 1984 review letter represented that Stuart Becker & Co. and Becker had selected from the information and assumptions that had been provided to them by MHT Properties, the information and those assumptions they deemed significant for inclusion in the Assumptions and the Notes set forth in the Sacramento Associates Private Placement Memorandum.

189. Gnesin has testified that Becker made changes in the Assumptions used in compiling the Financial Projections in order to make the Sacramento Associates Offering more marketable to his clients. Therefore, Stuart Becker & Co. and Becker knew that the Financial Projections and the Assumptions did not accurately reflect the judgment and knowledge of MHT Properties but instead (i) that the Financial Projections were false and not based on the Assumptions or Notes and (ii) that the Assumptions and Notes were likewise false.

190. Specifically, the Financial Projections were based on unreasonable assumptions regarding annual increases in future income which were contradicted by the short term nature of the leases in place at the Butano Property and provided to Becker as part of the draft private placement memorandum. As disclosed by the Sacramento Associates Private Placement Memorandum, ninety percent of the tenant leases expired within two years of the offering and as local real estate surveys show, the current market place vacancy rate was over twenty percent and yet Becker projected eight percent per year revenue increases through the year 2002.

Plaintiffs merely state that the Becker defendants "made changes" in the assumptions by forecasting a better rate of occupancy than turned out to be the case. This by itself would not be fraudulent if the Becker defendants had any reason to know that Butano Property would do either worse or better than the market vacancy rate, or thought it probable that the short-terms tenants would renew their leases. Such conclusory allegations still fail to allow an inference of scienter to be drawn, for an inference of fraud does not arise from the mere fact that an auditor reported on allegedly inaccurate data. *See O'Brien v. National Property Analysts Partners*, 719 F.Supp. 222, 228 (S.D.N.Y.1989); *The Limited v. McCrory Corp.*, 683 F.Supp. 387, 394 (S.D.N.Y.1988).

While the Alberti Complaint has now particularized the length of the Becker Defendants' relationship to the Rothschild Group, Complaint at ¶¶ 192–98, only the undated conversations of Gnesin plead facts from which it can be inferred that the Becker Defendants knew of any infirmities in prior transactions. *See O'Brien,* 719 F.Supp. at 228 (fact that defendant may have participated in fifty allegedly fraudulent tax shelter does not permit inference of knowledge of fraud); *Dannenberg v. Dorison,* 603 F.Supp. 1238, 1241 (S.D.N.Y.1985) (participation in prior transactions, absent pleading of facts from which inference of knowledge that any of these transactions was fraudulent, insufficient under Rule 9(b)).

■ However, other portions of the Complaint do allege details sufficient to impute fraud to the Becker defendants. The Complaint now states:

160. ... Gnesin has testified that Becker employed Jeffrey Zukoff ("Zukoff") an accountant who had previously been employed by Cornick Garber & Sandler to prepare projections for Rothschild Group private placement memoranda which disclosed the audit of those earlier offerings. Gnesin testifies that Zukoff also knew at the time of his employment at Becker that Stern and North American were not "independent" of the Rothschild Group......

197. ... Gnesin testified that Becker employed at the time of the Sacramento Offering Zukoff who knew Stern and North American were not "independent" of Trupin and the Rothschild Group, Becker knew that the transactions involving North American in the purchase and sale of the Sacramento Property were not the result of fully negotiated arms-length transactions and were not between unaffiliated parties and therefore the Wrap Around Note payable to North American did not represent a genuine obligation of Sacramento Associates and as such, the depreciation and interest deductions taken by taxpayers resulting from such debt would most likely be disallowed by the IRS....

198. ... Gnesin testified that at or before the time of the Sacramento Offering, he discussed with Becker the negative tax audit results of prior private placements sponsored by the Rothschild Group. Further, Gnesin testified that Zukoff was fully aware of the Rothschild Group audit problems....

200. ... Further, there was no disclosure of the fact that Becker and his affiliates, as testified to by Gnesin and Schaffer, had received commissions for selling interest in Sacramento Associates to Becker's clients and that such payments render Stuart Becker & Co. not 'independent' under accounting rules and therefore incapable of rendering the 1984 audit opinion. As a result, the 1984 audit was conducted in a manner which contravened generally accepted accounting principals contrary to the covering auditors' opinion letter.

The defendants claim that Zukoff was not employed by Becker at the time of the Sacramento Offering. However, this is a disputed issue of fact, and therefore does not permit dismissal. Amendments of a complaint "relating to projections or expectations offered to induce investments [whether or not the representations were contained in the offering memorandum] must allege particular facts demonstrating the knowledge of defendants at the time that such statements were false." *Luce,* 802 F.2d at 57. Becker's employment of an accountant who previously worked for the Rothschild's earlier accounting firm (Cornick, Garber, and Sandler) would permit an inference that Becker knew of the affiliated status of the mortgage-holder and the disallowance of the previous tax shelters. One of the financial projections prepared by Becker included a projected schedule of taxable income or loss for November 1, 1984 through December 31, 2002, and other included projected analysis of cumulative investment benefits and reinvestment benefits, which presumably would also make use of expected tax benefits. Complaint, at ¶ 183.

Since the assumptions behind Becker's projections depended on the availability of the promised tax deductions, this adequate-

ly alleges a claim against Becker. Parallel disclosures have been held to constitute scienter on the part of the accountants. "The Complaint alleges that Touche was told by a Lerner insider, Louis Lipschitz, of the existence and terms of the lease extension prior to the conclusion of the stock-purchase agreement.... Touche has thus been appraised of the details of an event that is alleged to support a 'strong inference that the defendant[ ] had knowledge of the facts," [*Ross v.* ] *A.H. Robins Co,* 607 F.2d [545] at 558 [(2d Cir.1979)].'" *The Limited,* 683 F.Supp. at 395. "Accountants do have a duty to take reasonable steps to correct misstatements they have discovered in.... financial statements on which they know the public is relying." *IIT v. Cornfeld,* 619 F.2d 909, 927 (2d Cir. 1980).

■ The Becker Defendants are also charged with aiding and abetting the fraudulent conduct of the other defendants. To establish aiding and abetting liability under the securities laws, a plaintiff must demonstrate (1) a securities violation by a primary wrongdoer, (2) knowledge of the wrongdoing, and (3) substantial assistance in the primary wrongdoing. *Armstrong v. McAlpin,* 699 F.2d 79, 91 (2d Cir.1983). Assuming that the Alberti Complaint pleads the first element, this omission also serves to imply knowledge by the Becker Defendants of the false and misleading statements in the Sacramento PPM. Therefore, the aiding and abetting claim is properly pleaded under Rule 9(b).

### Commonlaw Fraud and State Law Securities Fraud

The omissions identified by the Plaintiffs also support their allegations of common-law fraud. "The elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *Katara v. D.E. Jones Commodities, Inc.,* 835 F.2d 966 (2d Cir.1987). The Plaintiffs have alleged these elements with particularity.

Based on the sufficiency of the Plaintiffs' allegation of commonlaw fraud and federal securities fraud against the Becker defendants, the motions to dismiss the pendant state law claims for securities fraud also must be denied.

### Negligent Misrepresentation and Breach of Fiduciary Duty

■ The Becker Defendants, as accountants retained by the Partnership, did not owe any fiduciary or professional duty to Plaintiffs. In common law, lack of privity between limited partners and professionals involved in the offering has proved fatal to any claim of negligent misrepresentation or breach of fiduciary duty on the part of the professionals.

The narrow exception to this in New York law will not serve Plaintiffs. Following *White v. Guarente,* 43 N.Y.2d 356, 401 N.Y.S.2d 474, 372 N.E.2d 315 (1977), New York Courts have held that if the Plaintiffs' reliance was "within the contemplation of the parties to the accounting retainer.... assumption of the task of auditing and preparing the returns was the assumption of a duty to audit and prepare carefully for the benefit of those in a fixed, definable and contemplated group whose conduct was to be governed" by the audited reports because the auditors knew the plaintiff limited investors would use these for their tax returns. *Id.* at 361–62, 401 N.Y.S.2d 474, 372 N.E.2d 315. This holding has been narrowly construed, however, and privity remains the rule in New York as it does elsewhere. Plaintiffs, as members of the solicited investing public at the time the Becker defendants allowed the statements to be mailed, were not part of a definable and contemplated class.

Moreover, negligent misrepresentation "is not actionable unless expressed directly, with knowledge or notice that it will be acted upon, to one whom the author is bound by some relation of duty, arising out of contract or otherwise." *White v. Guarente,* 43 N.Y.2d 356, 362–63, 401 N.Y.S.2d 474, 478, 372 N.E.2d 315, 319 (1977).

### Plaintiffs Have Not Alleged that the Becker Defendants Engaged in a "Pattern" of Racketeering Activity

■ To state a cause of action under civil RICO (18 U.S.C. § 1961 *et seq.*), Plaintiffs must allege:

(1) that the defendant (2) through the commission of two or more acts (3) constituting a "pattern" (4) of "racketeering activity" (5) directly or indirectly invests in, or maintains an interest in, or participates in (6) an "enterprise" (7) the activities of which affect interstate commerce. *Moss v. Morgan Stanley Inc.*, 719 F.2d 5, 17 (2d Cir.1983), *cert. denied sub nom.*, *Moss v. Newman*, 465 U.S. 1025, 104 S.Ct. 1280, 79 L.Ed.2d 684 (1984). Moreover, it is well-settled that where, as here, the predicate crimes of a RICO claim sound in fraud, the pleading of those predicate acts must satisfy the particularity requirement of Federal Rule of Civil Procedure, Rule 9(b) ("Rule 9(b)" or "9(b)"). *See Morin v. Trupin*, 711 F.Supp. 97, 111 (S.D.N.Y.1989) (citing *The Limited v. McCrory Corp.*, 645 F.Supp. 1038, 1041 (S.D.N.Y.1986); *Equitable Life Assur. Society v. Alexander Grant & Co.*, 627 F.Supp. 1023, 1028 (S.D.N.Y.1985)); *Fidenas A.G. v. Honeywell, Inc.*, 501 F.Supp. 1029, 1042–43 (S.D.N.Y.1980). The pleading of the predicate crime of mail fraud must also specify the use of the mails or wires. *Frota v. Prudential–Bache Secs., Inc.*, 639 F.Supp. 1186, 1192 (S.D.N.Y.1986). In fact, "all of the concerns that dictate that fraud be pleaded with particularity exist with even greater urgency in civil RICO actions." *Plount v. American Home Assurance Co.*, 668 F.Supp. 204, 206 (S.D.N.Y.1987).

This court has held that the unamended complaint in the substantially similar case of *Morin v. Trupin* adequately pleaded the existence of two enterprises (as translated here, the Sacramento Enterprise and the Syndication Enterprise) and of the "continuity" necessary to establish a "pattern" of racketeering activity. *Morin v. Trupin*, 747 F.Supp. 1051, 1066 (S.D.N.Y.1990). In the same opinion, the court held, however, that the unamended complaint failed to plead with the requisite particularity. This has now been remedied.

The Alberti Complaint must plead the commission of at least two predicate acts in the manner contemplated by *Morin*. The Alberti Complaint alleges that through their preparation of the Financial Projections in the Sacramento PPM, the Becker defendants committed securities fraud un-

der § 10(b) pursuant to 15 U.S.C. § 78j(b), wire fraud pursuant to 18 U.S.C. § 1341, and fraudulent concealment. The Plaintiffs have alleged that the Becker defendants have committed at least two acts of racketeering activity within ten years: falsifying figures for the Sacramento Associates Offering and attempting to sell the Sacramento Associates Offering knowing that it contained those false figures. Only the second act has been plead with the particularity required under 9(b).

### The Mintz, Fraade Defendants

The Alberti Third Amended Complaint again charges the Mintz Fraade Defendants with violations of RICO pursuant to 18 U.S.C. § 1961 *et seq.*, violations of Section 10(b) and Rule 10b–5, violations of state securities laws, common law fraud, negligent misrepresentation, legal malpractice and breach of fiduciary duty.

### 10(b) Claim

The Alberti Third Amended Complaint alleges that the Mintz Fraade Defendants are liable under 10(b) for material misstatements and omissions in the Sacramento Associates PPM. The core of the allegations remain the same as the ones alleged in the Second Amended Complaint (*see Morin*, 778 F.Supp. 711, at 720). Mintz, Fraade is alleged to have misrepresented (1) the manner in which the Butano Property was acquired; (2) the availability of interest deductions based on the interest rate on the purportedly genuine obligation represented by the Wrap–Around Note to North American; (3) the lack of a requirement to pay interest on the Wrap Around Note on a current basis; (4) the arm's-length nature of the transaction between North American and Sacramento Associates; (5) the omission of the negative audit history of past Rothschild Group syndications; and (6) the deductibility or capitalizability of various management and consulting expense.

This Court previously held that the Alberti Complaint adequately pleads misrepresentations in the Mintz Fraade Defendants' tax opinions as to the manner in which the Butano Property was acquired. Specifically, the Complaint alleged that as

attorneys for North American, Mintz Fraade knew that North American was affiliated with the Rothschild Group and that in May, 1987, defendant Alan Fraade had admitted as much to defendant Gary Rogers.

Plaintiffs cite representations contained in the Sacramento PPM that the Butano Property was acquired by Sacramento Associates after a series of transfers through other buyers and sellers during the course of which the price of the Butano Property became inflated. Complaint at ¶¶ 168–74. Plaintiffs allege that these representations were false, citing as a source for this accusation the title documents, which they cite as proof that title passed directly from the initial seller to Sacramento Associates. *Id.* at ¶¶ 170–71. Plaintiffs also allege that the Mintz Fraade Defendants had served as counsel for both the Rothschild Group entities and North American, as represented in the Sacramento PPM itself. *Id.* at ¶ 174.

These allegations give rise to a "strong inference" that the Mintz Fraade Defendants were aware that several representations in the Sacramento PPM were false. First, Mintz Fraade's representation of North American at the time of the Sacramento PPM gives rise to the inference that they knew that North American played no part in the chain of sale of the Butano Property. This inference in turn gives rise to the inference that they knew that the Sacramento PPM's representation as to the price purportedly paid by Sacramento Associates for the Butano Property was not bona fide and therefore a not a proper basis on which to calculate tax benefits. Second, the Mintz Fraade Defendant's awareness that North American was at best only a paper interim buyer and seller gives rise to the inference that they knew that the Wrap–Around Note was not a genuine obligation and therefore not properly includible in the tax basis for Sacramento Associates or in any determinations for tax benefits.

Plaintiffs have remedied their prior pleading errors by alleging details which show that Mintz Fraade knew its client North American was not an independent entity:

> 208. The Mintz Fraade Defendants knew that North American was affiliated with the Rothschild Group ... because, as Gnesin and Schaffer testified, Mintz Fraade ... in structuring and designing each of the transactions involving the purchase and sale of the Butano Property ... never included North American or its President, Stern, in any conference or meeting regarding those transactions.

The Plaintiffs have alleged, that "[a]s Schaffer and Gnesin testified, [North American President Stuart] Stern was a boyhood friend of Trupin and a former taxi driver with no significant business experience and was, at the time of these transactions, subject to Trupin's immediate authority and control," Complaint at ¶ 78, and that North American was one of many paper entities formed at Trupin's direction. *Id.* at ¶ 75. As evidence of the close connection between Trupin, the Plaintiffs allege that in 1987 Stern participated as a joint venturer with Trupin in the acquisition of interests in an entity known as Sun Belt Realty Corp. with the funds Trupin misappropriated from the refinancing of the underlying debt on the Sarasota Property. *Id.* at ¶ 168.

Plaintiffs have added new portions to the Third Amended Complaint to reallege that Mintz Fraade knew of and deliberately concealed the Rothschild Groups negative audit history:

> 161. Schaffer and Gnesin have testified that the Mintz Fraade Defendants were specifically advised in late 1983 or early 1984 of the tax audit problems of the Rothschild Group equipment tax shelters by Trupin, Schaffer, Gnesin and Haber and were provided with copies of certain prior Rothschild Group private placement memoranda in which there was disclosure of the adverse audit history. Further, the Mintz Fraade Defendants advised Trupin at the time of the syndication of the Sacramento Associates Offering that by using different general partner entities in Rothschild Group syndications, there would be no need to disclose the prior adverse IRS audit history of the

Rothschild Group in the Sacramento Associates Private Placement Memorandum.

175. The Mintz Fraade Defendants were retained by the Rothschild Group to draft the Sacramento Associates Private Placement Memorandum. Schaffer and Gnesin have testified that at the time of the preparation Sacramento Associates Private Placement Memorandum, the Rothschild Group provided the Mintz Fraade Defendants with copies of all documents relevant to the Butano Property including mortgage documents, leases, rent rolls, title reports, acquisition and sales contracts, appraisals and management agreements. Further, as part of their due diligence, the Rothschild Group provided the Mintz Fraade Defendants with detailed information regarding the relevant real estate markets including details of the immediate property area, the condition of each of the Investor Properties, and the actual vacancy rates for commercial properties in the locale of the Butano Property (hereinafter, collectively "Due Diligence Documents"). As a result the Mintz Fraade Defendants also knew of the misrepresentations and omissions [complained of].

207. (b).... Mintz Fraade was provided with the private placement memoranda for Rothschild Group tax shelters which disclosed the prior syndications' audit problems.

This pleads specific facts and sources for those facts, and therefore provides a basis from which an inference of fraud can be drawn.

### Negligent Misrepresentation, Breach of Fiduciary Duty, and Legal Malpractice

 As with the Becker defendants, the Plaintiffs' allegations fail for lack of privity. A law firm hired by sponsors of a limited partnership offering is not liable to purchasers of partnership interests or limited partners for negligence or malpractice, since the law firm owes no them no duty.

### Commonlaw Fraud and State Securities Fraud

 Plaintiffs allege that the Mintz Fraade defendants intentionally assisted the other defendants' fraud committed in the solicitation of purchasers for interests in the Sacramento Associates Offering. Since the Plaintiffs have alleged that the Mintz Fraade defendants knew that the proposed tax benefits would probably be disallowed by the I.R.S. and that the value of the Properties had been falsely inflated through paper transfers, Plaintiffs succeed here for the same reason they succeed in alleging fraud with sufficient particularity on the part of the Becker defendants' fraud. As with the Becker defendants, they have alleged that they relied on the misleading PPMs, prepared by Mintz fraade, and that the omission caused the economic harm (since the tax benefits were an integral part of the deal, the misrepresentation concealed the fact that tax benefits would never be permitted by the I.R.S.).

Because of the sufficiency of the Plaintiffs' allegation of commonlaw fraud and federal securities fraud against Mintz Fraade, the motions to dismiss the pendant state law claims for fraud also must be denied.

### Plaintiffs Have Alleged that the Mintz Fraade Defendants Engaged in a "Pattern" of Racketeering Activity

The Alberti Complaint charges the Mintz Fraade Defendants with violating 18 U.S.C. §§ 1962(a)–(d), claiming as predicate acts the securities frauds set forth in the Complaint, ¶¶ 166–237, the "multiple acts of indictable mail fraud" set forth in ¶¶ 147–237, and the acts of fraudulent concealment set forth in ¶¶ 246–61. Because the Alberti Complaint now pleads with particularity at least two predicate acts by the Mintz Fraade Defendants, the RICO claims stand.

### *Emmanuel Organek and Continental Realty*

Plaintiffs' claims against Organek in the Alberti Amended Complaint were dismissed for insufficient particularity in this Court's opinion dated September 29, 1990 (*Morin v. Trupin*, 747 F.Supp. 1051 (S.D.N.Y.1990).

This is only the second time that Plaintiffs have pled fraud against Organek and the company he is alleged to control, Continental Realty; the claims against Organek were not repled in the Second Amended Complaint, and dismissal was based only on the insufficiency of the pleading:

Plaintiffs' primary method of opposing Organek's motion was to submit an affidavit of Jeremy Morley ("Morley"), plaintiffs' counsel.... Defendants correctly point out that Morley lacks personal knowledge of many of the matters discussed in his affidavit, and that therefore he is not competent to testify about them. Furthermore, many of the assertions which might connect Organek to the syndication and Trupin's alleged fraudulent behavior are based on uncorroborated hearsay evidence.... None of this evidence is sufficient to raise triable issue of Organek's involvement in the syndications.

*Morin,* 747 F.Supp. at 1070.

### 10(b) Claims

■■■ The Plaintiffs allege that the Offering Materials disclosed that Continental advised the Rothschild Group between 1983 and 1987 in connection with approximately 18 real estate syndications, including the Sacramento Associates Offering, involving 13 commercial real estate properties. They allege that Organek was more of an insider than either the Becker defendants or the Mintz Fraade defendants, and that his sole employer was Trupin. Organek's duties in the Trupin hierarchy, they allege, included locating real estate to be syndicated; acquiring these properties for the Rothschild Group; negotiating the acquisitions; structuring the transactions and financing the acquisition of the properties; obtaining loans for the acquisition of these properties; financial restructuring when syndication revenues did not generate sufficient funds; conducting the Rothschild Group's due diligence investigation preceding the acquisition of the properties; and obtaining and reviewing real estate information regarding the syndicated properties for inclusion in the relevant private placement memorandum.

These allegations of Organek and Continental's activity to promote the interests of the syndication are still too insufficiently particular to link either to the preparation of the PPM or the sale of the partnership interests. Plaintiffs do not give one particular instance of an occasion in which Organek conducted due diligence, or specify what pieces of real estate information be reviewed, or what elements of any particular instance of financial restructuring were actually Organek's plan.

They do allege that Organek negotiated the sale of the Butano Property to Continental and the initial financing with sufficient dates, names, and places to plead particularity under Rule 9(b). Complaint, at ¶¶ 106–128. They allege that Organek told the seller on December 18, 1984, that Sacramento Associates would be substituted as the purchaser of the Butano Property in place of Continental. They claim that:

129. Contrary to the representations in the Sacramento Associates Private Placement Memorandum, the transactional documents reveal that all brokerage services contributing to Sacramento Associates' purchase of the Butano Property were performed by the Sacramento office of Coldwell Banker.

130. Nevertheless, Continental and Organek consented to the use of their names in the Sacramento Associates Private Placement Memorandum which identifies Continental as the broker who received a purported $750,000.00 brokerage fee out of the proceeds of the Sacramento Associates Offering.

131. As reflected in the contract of sale and closing statement, the only brokerage fee paid was a fee of four percent of the $10,500,000.00 gross sale price or $420,000.00 which was paid by the Benvenutis as seller to Coldwell Banker as broker.

132. The $750,000.00 payment disclosed in the Sacramento Associates Private Placement Memorandum to Continental was not included in the closing statement as a brokerage or co-brokerage fee. In fact, California public records reveal that at all relevant times Continental was not

licensed as a real estate broker under California law and its receipt of any brokerage fee for this transaction would therefore have been illegal.

133. The closing documents disclose that the acquisition price from the Benvenutis was $10,500,000.00 (including a $420,000.00 brokerage fee paid to Coldwell Banker not disclosed in the Sacramento Associates Private Placement Memorandum). The $11,250,000.00 price that the Sacramento Associates Private Placement Memorandum states was paid by SRC, a fictional acquiring entity that does not appear in the title documents for the Butano Property, therefore, does not represent the actual acquisition price but instead includes the $750,000.00 fee misappropriated to Continental by means of a payment falsely identified as a brokerage fee.

Aside from these allegations concerning the $750,000.00, the Plaintiffs merely allege that Organek was an insider and co-conspirator involved on a day-to-day basis who knew of all the misrepresentations. As evidence of this, the Plaintiffs allege that Organek and Continental were affiliates of the Rothschild Group who helped to structure the transactions at every stage. Complaint, at ¶ 104.

█ But the passages about the brokerage fee in the Third Amended Complaint plead securities fraud against Organek with particularity. Plaintiffs essentially allege that Organek inflated the price of the security sold to them by including in that price a fraudulent brokerage fee by inventing a new transfer of title (from SRC) so that the base price on the closing documents would cover the real brokerage fee and Continental's fee could then be charged on top of that. The disclosure of the $750,000 brokerage fee to the Plaintiffs in the PPM connects Organek to a fraudulent misrepresentation made to the Plaintiffs in a manner sufficient to survive Organek's motion to deny leave to replead.

### Aiding and Abetting the 10(b) Violations

█ This also particularizes the allegation of aiding and abetting liability on the part of Organek. Again, the standards for aiding and abetting securities law violations are clear:

> [T]here must be shown (1) a securities law violation by a primary party, (2) scienter on the part of the aider and abettor and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation.

*National Union Fire Ins. Co. v. Trutur,* 892 F.2d 199 (2d Cir.1989); *IIT v. Cornfeld,* 619 F.2d 909 (2d Cir.1980). "[I]naction can provide a basis for liability, in the absence of a duty to act, only when 'designed intentionally to aid the primary fraud.'" *Armstong v. McAlpin,* 699 F.2d 79, 91 (2d Cir. 1983). Organek, as negotiator of the purchase of the Butano Property, knew the price paid and that the price in the PPM was different from and higher than the price in the documents he was negotiating. Plaintiffs, therefore, have successfully alleged the second element of aiding and abetting liability. Since Organek and Continental rendered assistance to the other defendants by keeping silent about the misstatements in the PPM, Plaintiffs have alleged the third element of aiding and abetting liability.

### State Law Securities Fraud and Common Law Fraud

█ The omissions identified by the Plaintiffs also support their allegations of commonlaw fraud. Again, the elements of common law fraud are a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to Plaintiffs. *Katara, supra,* 835 F.2d at 968. The Plaintiffs have alleged these elements with particularity.

Based on the sufficiency of the Plaintiffs' allegation of commonlaw fraud and federal securities fraud against Continental and Organek, the motions to dismiss the pendant state law claims for securities fraud also must be denied.

### Plaintiffs Have Alleged a Violation of RICO

Plaintiffs allege that, in addition to the aid Organek and Continental supplied to

the general scheme, Continental is part of the association-in-fact necessary to assert a RICO claim because it knowingly received the brokerage fee, and knowingly used income from Sacramento Associates offering to establish the Sacramento Enterprise within the meaning of 18 U.S.C. § 1962(a). Organek's general activity is also alleged to conform to pattern of racketeering activity as defined by 18 U.S.C. § 1961(1) and (5).

■ Since the general allegations of involving with the syndication fail for lack of particularity, the sole allegation which stands is the allegedly fraudulent brokerage fee. Since this court found that Plaintiffs have adequately alleged the existence of two enterprises (*Morin v. Trupin*, 747 F.Supp. 1051, 1065 (S.D.N.Y.1990)), the sole question remaining under the RICO claims is whether Continental's receipt of the brokerage fee is an investment of racketeering income in violation of 18 U.S.C. § 1962(a). Since the RICO racketeering claims survive the motions to dismiss, Continental's receipt of the money as an allegedly fraudulent brokerage fee could be receipt of racketeering income. Therefore, the first claim of the Plaintiffs against Continental pleads a violation of RICO with particularity.

■ Aside from alleging prejudice due to the expense of preparing his defense, Organek and Continental have argued that all RICO claims are barred by the statute of limitations. They are correct when they cite *Agency Holding Corp. v. Malley–Duff & Assocs., Inc.*, 483 U.S. 143, 155–56, 107 S.Ct. 2759, 2767, 97 L.Ed.2d 121 (1987) for RICO's four-year statute of limitations, and *Bankers Trust Co. v. Rhoades*, 859 F.2d 1096, 1102–03 (2d Cir. 1987), *cert. denied sub. nom. Soifer v. Bankers Trust Co.*, 490 U.S. 1007, 109 S.Ct. 1642, 104 L.Ed.2d 158 (1989). But they are incorrect in alleging that the date of "inquiry notice" (the time when a plaintiff, in the exercise of reasonable diligence, should have discovered his injury) is the date Plaintiffs first received financial and tax information pertaining to their purchase in 1985. According to Organek and Continental, the latest time Plaintiffs could have received information which would have put Plaintiffs on "inquiry notice" of their fraud is 1986.

Offering materials can provide inquiry notice, but in this case they do not. Organek and Continental ignore this Court's prior opinions on the subject, especially the opinion dated July 27, 1992 (*Morin v. Trupin*, 799 F.Supp. 342 (S.D.N.Y.1992)). In that opinion, and in the prior opinion filed November 18, 1991 (778 F.Supp. 711) the correct statute of limitations for the Plaintiffs in *Morin* and the related action of *Ahmed* was considered in detail. These decisions have already dismissed as time-barred certain Plaintiffs whose claims have been abrogated by the Supreme Court's decision in *Lampf, Pleva, Lipkind, Prupis & Petigra v. Gilbertson*, —— U.S. ——, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991) and reinstated others pursuant to § 476 of the Federal Deposit Insurance Corporation Improvement Act of 1991, codified in Section 27A of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa. Organek's and Continental's argument that the Plaintiffs were put on "inquiry notice" within a year of their purchase has no merit in light of the fact that Plaintiffs allege fraudulent concealment on the part of the Rothschild Group by citing a series of letters sent to the Plaintiffs which assured them that income from the properties would increase and that all the investments of the Rothschild Group were doing well. Complaint, at ¶¶ 259–263. The Plaintiffs allege they could not have discovered the fraud until the Butano Property was sold in foreclosure in August 1989.

It is true that "the statute is not tolled for a plaintiff's "leisurely discovery of the full details of the alleged scheme." *Klein v. Bower*, 421 F.2d 338, 343 (2d Cir.1970). Instead, the period runs from the time at which a plaintiff "should have discovered the general fraudulent scheme." *Robertson v. Seidman & Seidman*, 609 F.2d 583, 587 (2d Cir.1979) (quoting *Berry Petroleum Co. v. Adams & Peck*, 518 F.2d 402, 410 (2d Cir.1975))." *Kronfeld v. Advest, Inc.*, 675 F.Supp. 1449, 1458 (S.D.N.Y.1987). *Accord Arneil v.*

*Ramsey,* 550 F.2d 774, 780 (2d Cir.1977). Since the Second Circuit follows the objective standard for inquiry notice, the information provided must trigger notice "with sufficient storm warnings to alert a reasonable person to the [probability] that there were either misleading statements or significant omissions involved in the sale of the [securities]"; *Armstrong, supra,* 699 F.2d at 88; *Quantum Overseas N.V. v. Touche Ross & Co.,* 663 F.Supp. 658, 664 (S.D.N.Y.1987) (citations omitted). The triggering financial data must be such that it *relates directly* to the misrepresentations and omissions the Plaintiffs later allege in their action against the defendants. *Compare Freschi v. Grand Coal Venture,* 583 F.Supp. 780, 785 (S.D.N.Y.1984) (disclosures of the high-risk nature of the investment did *not* trigger inquiry notice when Plaintiffs' claims were based on alleged misrepresentations not related to the riskiness of the investment) *with Farr v. Shearson Lehman Hutton, Inc.,* 755 F.Supp. 1219, 1225–26 (S.D.N.Y.1991) (disclosures of the high-risk nature of the investment *did* trigger inquiry notice when Plaintiffs' claims were based on alleged misrepresentations related to the unsuitability of the investment as too risky). Here, the Plaintiffs have alleged specific nondisclosure and misrepresentations, not merely inadequate characterizations of the safety of their investment.

Continental also claims that the four-year statute of limitations begins to run no later than 1986 because the Complaint does not attribute any conduct to either Organek or Continental after that year. This argument is unavailing, for notice of the RICO claims begins to run only when the Plaintiffs know or have reason to know of the injury that is the basis of the action. *Zola v. Gordon,* 701 F.Supp. 66, 68–69 (S.D.N.Y.1988). There was nothing readily discoverable about Continental's allegedly fraudulent brokerage fee. Organek and Continental's motion to dismiss based on inquiry notice is denied.

## II. THE MORIN ACTION

### Facts

The *Morin* Plaintiffs are sixty-three investors in limited partnership interests in nine unsuccessful Florida limited partnerships formed to own and operate commercial real estate (the "Investor Partnerships") and in four trusts formed to purchase and own helicopters (the "Airjet Trusts"). The Investor Partnerships were organized to acquire interests in four other limited partnerships, which in turn were organized to own and operate commercial real estate located in Sarasota, Florida; Grand Rapids, Michigan; Dallas, Texas; and Indianapolis, Indiana (collectively, the "Properties"). The Third Amended Consolidated Complaint (the "Morin complaint") alleges that Trupin, Rothschild Reserve and numerous other defendants, including the Moving Defendants, fraudulently induced the *Morin* Plaintiffs to invest in the Investor partnerships and the Airjet Trusts through allegedly unlawful securities offerings promoted by allegedly fraudulent private placement memoranda (the "118–119, 130 Series and 218 PPM's") and other offering materials (collectively, the "Morin Offering Materials"). The *Morin* action is a consolidation of various related litigations involving the Investor Partnerships and Airjet Trusts. Despite differences in the subject matter of the limited partnerships and trusts involved in the *Morin* action, the schemes, various misdeeds, acts allegedly attributable to each of the Moving Defendants and the substance of the 118–119, 130 Series and 218 PPM's are substantially similar to those involved in the *Alberti* action.

### Prior Proceedings

The *Morin* Plaintiffs, who brought their claims originally in four separate actions, filed their complaints on August 17, 1988 (the original *Morin* complaint), November 29, 1988 (the *Blaikie* complaint), May 23, 1989 (the *Petersen* complaint) and October 18, 1989 (the *Seal* complaint). These four complaints were consolidated under index number 88 Civ. 5743 in December of 1989. The Plaintiffs named as defendants (among others) Barry Trupin ("Trupin"), trusts and companies alleged to be controlled by him or members of his family, the appraisers of

the limited partnerships, the Mintz Fraade defendants, Organek, Continental, and others. The first Amended Complaint in the *Morin* action was dismissed for failure to plead fraud with particularity pursuant to Rule 9(b) on September 29, 1990 (747 F.Supp. 1051). The *Morin* Plaintiffs' Amended Consolidated Complaint was re-filed on December 29, 1990, this time without naming Continental or Organek as defendants, and amended again in April, 1991 to add additional Plaintiffs. The *Morin* Plaintiffs' Second Amended Consolidated Complaint was dismissed for being retroactively time-barred under *Lampf* on November 18, 1991 (*Morin v. Trupin*, 778 F.Supp. 711 (S.D.N.Y.1991)). After Congress amended § 476 of the FDIC Improvement Act of 1991 to allow retroactively barred securities fraud claims to proceed, the *Morin* Plaintiffs moved to reinstate their claims. Certain of the *Morin* Plaintiffs, previously dismissed as time-barred, were reinstated together with certain *Alberti* Plaintiffs pursuant to this Court's opinion filed on July 28, 1992 (799 F.Supp. 342). The *Morin* Plaintiffs have since then moved for leave to amend by filing their Third Amended Consolidated Complaint against the original named defendants, including Continental and Organek.

### Discussion

Only the Mintz Fraade defendants have filed a separate opposition against the Third Complaint in the *Morin* action. The oppose it for precisely the same reasons they oppose the Third Amended Complaint in *Alberti*, disposed of *infra*.

This relative lack of response is not surprising, given that the *Morin* complaint repleads the same allegations with the same new additions as in the *Alberti* Complaint. The relevant new passages in the Third Amended Consolidated *Morin* Complaint concerning the Mintz, Fraade defendants are:

190. The identity of the true promoters and sponsors of the 118–119, 130 Series and 218 Offerings as well as the adverse audit history of prior Rothschild Group tax shelters was known to the Mintz Fraade Defendants, Organek, La-venthol and Lesser, Stern, Trupin, Bennett Trupin, Berlin, Bucci, Kaye, Silverstein, Bills and Gary Rogers. In this regard, Gerald Schaffer and Gnesin have testified that the Mintz Fraade Defendants were specifically advised in late 1983 or early 1984 of such tax audit problems by Trupin, Schaffer, Gnesin and Haber and were provided with copies of certain prior Rothschild Group private placement memoranda in which there was disclosure of the adverse audit history. Further, Mintz Fraade advised Trupin at the time of the syndication of each of the 118–119, 130 Series and 218 Offerings that by using Bennett Trupin, Trupin's father, as the owner of the general partner entities in these syndications, there would be no need to disclose the prior adverse audit history of the Rothschild Group in the Private Placement Memoranda.

192. ... (b) The Mintz Fraade Defendants, who were the attorneys for the Rothschild Group in the acquisition of the Investor Properties and in the syndications of those properties, also acted as attorneys for North American and American Realty.

(c) Neither North American, American Realty or Stern negotiated the terms of the transfer of the Investor Properties from the Acquiring Entities to the Stern Partnerships and subsequently, from the Stern Partnerships to the Owning Partnerships.

195. Gerald Schaffer and Gnesin have testified that at the time of the 118–119, 130 Series and 218 Offerings, the Mintz Fraade Defendants were intimately familiar with the operation of the Rothschild Group. In late 1983 or early 1984, Mintz and Fraade met with Gerald Schaffer, Haber and Gnesin to discuss the structure of the Rothschild Group real estate tax shelters. The Mintz Fraade Defendants acted as counsel for the Rothschild Group entities that participated in the 118–119, 130 Series and 218 Offerings and consulted with Trupin, Schaffer, Gnesin and Haber regarding these transactions. As a result, the Mintz Fraade Defendants knew and ap-

proved of the use of Stern, North American and American as described in paragraphs 191–194 above.

201. At the time of the preparation of offering documents for the 118–119 Series Offering, the Mintz Fraade Defendants were provided by the Rothschild Group with all relevant Due Diligence Documents including real estate acquisition and sales documents regarding the Sarasota Property. As a result, the Mintz Fraade Defendants knew that the disclosures in the 118–119 Private Placement Memoranda regarding the transactions described in paragraph 200 above involving the Sarasota Property were materially false and misleading. In fact, Gerald Schaffer has testified that the decision not to disclose the $15,200,000.00 purchase price paid by Whitehall to acquire the Sarasota Property from United First Federal Savings and Loan Association was made with the advice and approval of the Mintz Fraade Defendants after a series of discussions with Trupin, Haber and Gerald Schaffer.

281. ... (a) Based on their role as attorneys for the Acquiring Entities, North American and American Realty and the Owning Partnerships as described in paragraphs 108–110 hereof and their receipt of the Due Diligence Documents referred to in paragraph 199 hereof from the Rothschild Group, the Mintz Fraade Defendants knew that: (i) each Investor Property had been acquired from independent third party by a Rothschild Group entity at an arms-length price which was materially less than the price described in the 118–119, 130 Series and 218 Private Placement Memoranda as the price paid by the Owning Partnerships; (ii) North American and American Realty were in reality controlled by and affiliated with Trupin and the Rothschild Group because Trupin controlled North American and American's legal work and neither ever negotiated the terms and conditions of their acquisitions or sales of any of the Investor Properties; and (iii) the purported acquisition of the Investor Properties by the Owning Partnerships from North American and American Realty did not constitute sales for tax purposes as freely negotiated transactions that would withstand audit by the IRS because Stern never negotiated those transactions and was completely controlled by Trupin; and

(b) The Mintz Fraade Defendants were advised by Schaffer, Gnesin and Haber that the IRS had routinely disallowed tax deductions in earlier tax shelters promoted by the Rothschild Group which involved similarly structured acquisition arrangements and, further, Mintz Fraade was provided with many of the private placement memoranda for these Rothschild Group tax shelters.

282. The Mintz Fraade Defendants knew that North American and American Realty were affiliated with the Rothschild Group, that the Wrap–Around Notes were not negotiated in arms-length transactions and that the interest on the notes exceeded commercially reasonable rates because, as Gnesin and Schaffer testified, Mintz Fraade assisted Trupin and the Rothschild Group in structuring and designing each of the transactions as part of a cohesive whole and never included North American or American's President Stern, in any conference or meeting regarding those transactions. Nevertheless, the Mintz Fraade Defendants also misrepresented in their tax opinions that it was more likely than not:

(a) that the initial tax basis for the 118–119, 130 Series and 218 Limited Partnerships would include their proportionate share of the Wrap–Around Notes and that the Wrap–Around Notes supported the depreciation deductions described in the 118–119, 130 Series and 218 Private Placement Memoranda;

(b) that the Owning Partnerships would be able to deduct their proportionate share of the interest on the Wrap–Around Notes and that the Wrap–Around Notes supported the interest deductions described in the 118–119, 130 Series and 218 Private Placement Memoranda.

These concern, with slight variations, the same questions as decided in the related action of *Alberti*. The same allegations are made about Organek and Continental. For the 110–119, 130 Series and the 218 Offering, the *Morin* Complaint states:

201. ... (a) Contrary to the representations in the 130 Series Private Placement Memoranda, the acquisition documents reveal that Encore, an entity controlled by Defendant Gary Rogers, as opposed to Continental, acted as the broker for the DR Realty Associates purchase of the Dallas Property. The fees paid to Continental were thus not for brokerage services; instead, Continental and Organek assisted Gerald Schaffer in structuring the transactions and acquiring financing for the acquisition of the Dallas Property.

217. This misappropriation of the proceeds of the 130 Series Offering included:

..... (e) Continental received approximately $235,125.00 and $261,450.00 for what was described as brokerage fees for locating the Dallas and Indianapolis Properties when, in fact, Encore was the broker on the "Dallas Property as described by the transactional documents.

218. ... (d) Continental received approximately $373,500.00 for what was described as a brokerage fee for locating the Indianapolis Property when in fact the fee was in payment for the assignment by a Continental affiliate of the purchase contract to the Acquiring Partnership.

The Becker defendants are not named in this *Morin* Complaint, and the other defendants have not moved in opposition.

### Conclusion

For the reasons given above, the motion for leave to file the Third Amended Consolidated Complaint and the Third Amended Complaints is granted in *Morin* and in *Alberti*.

It is so ordered.